**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

CURTIS J. GARRETT,

                *Plaintiff*,

v.

COMMONWEALTH OF VIRGINIA *by and through the Virginia Department of Corrections*, OFFICER MATTHEW FRANKLIN, OFFICER CHRISTOPHER SHY, WARDEN ISRAEL HAMILTON, WARDEN CARL MANIS, HAROLD W. CLARKE *in his individual capacity and official capacity as Director of the Virginia Department of Corrections*, A. DAVID ROBINSON *in his individual capacity and official capacity as Chief of Operations for the Virginia Department of Corrections*, WILLIAM BARBETTO *in his individual capacity and official capacity as Statewide Canine Program Coordinator*, STEVE HERRICK *in his individual capacity and official capacity as Health Services Director for the Virginia Department of Corrections*, BARRY MARANO *in his individual capacity and official capacity as Americans with Disabilities Act Coordinator for the Virginia Department of Corrections*, and Does 2-10

                *Defendants.*

CASE NO. 3:20-CV-00986

**JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.     On Christmas Day 2018, just four months shy of his release from custody, Mr. Curtis J. Garrett was alone in his cell at Sussex I Prison when two prison guards opened his door and unleashed their patrol dogs, ordering them to attack Mr. Garrett. The canines immediately began

mauling his arms and legs. Those officers, Defendant Franklin and Defendant Shy, then further assaulted Mr. Garrett, kicking and punching him and even slamming him into the wall of his cell while their canines continued to dig their teeth into Mr. Garrett's limbs.

2.     Although the use of canines in a force capacity is widely recognized as an extreme and brutal measure, the official policies, practices, and customs of the Virginia Department of Corrections ("VDOC") continue to allow the use of unmuzzled canines to terrify and attack prisoners. VDOC's policies, practices, and customs in this regard permit, condone, and ratify the acts and omissions of officers like Defendant Franklin and Defendant Shy, who engage canines to bite or physically restrain prisoners in a malicious, violent, and brutal fashion. The conduct of such officers within VDOC detention facilities constitutes a clear violation of the constitutional rights of prisoners, including Mr. Garrett.

3.     Indeed, as a result of this malicious canine attack, Mr. Garrett was severely injured, suffering deep wounds in his left hand and arm, and right leg that required an emergency visit to Southside Regional Medical Center. He is still suffering from these injuries today.

4.     However, the indignities inflicted upon Mr. Garrett did not stop there. Upon discharge and return to Sussex I, Mr. Garrett was removed from the general population and placed in solitary confinement for approximately five weeks with almost no medical care. From the end of December through the end of January, the Medical Department staff refused or neglected to change Mr. Garrett's dressings. Unable to extend his arm to change his own dressings due to the attack, Mr. Garrett's wounds became severely infected. Finally, only after pretending to be dead, Mr. Garrett received medical treatment for his infection.

5.     As Mr. Garrett became sicker and sicker, he requested to be transferred to a hospital. Instead, he was transferred by Defendant Warden Israel Hamilton and VDOC Defendant Clarke,

2

not to a hospital or medical facility, but to Wallens Ridge, a facility with *less* capacity for providing medical care. Once there, he was told he would have to change his own dressings and was left largely to fend for himself.

6.     Upon arriving at Wallens Ridge, officers confiscated Mr. Garrett's cane, which he needed to walk due to the injuries to his right leg. Mr. Garrett then requested, and received, a reasonable accommodation due to his inability to walk—that meals be brought to his cell because he could not move around the facility unassisted. But the very same prison officer who granted Mr. Garrett's request abruptly changed course, one day simply refusing to deliver Mr. Garrett food and claiming no such accommodation was required.

7.     Mr. Garrett was released from Wallens Ridge in May 2019, still suffering from the results of the attack, lack of medical treatment, and VDOC's disregard of his physical disabilities. He has no sensation or control over his dominant left hand; he is currently unable to write with his hand or engage in everyday activities that require opening or clenching his hand to its fullest extent. He has extended nerve damage to his right leg and suffers a "dead leg" that is almost completely numb. Placing any weight on his right foot causes searing pain that radiates up his leg.

8.     Mr. Garrett's injuries are not just physical. He was diagnosed with Post Traumatic Stress Disorder ("PTSD") and depression. Mr. Garrett has recurring nightmares of the attack that often render him unable to sleep. He has severe panic attacks at the mere thought of dogs barking. And sadly, earlier this month, Mr. Garrett was institutionalized at Tucker Mental Institution for a mental breakdown caused by trauma associated with the canine attack and its aftermath.

9.     Mr. Garrett now brings this action to hold Defendants accountable for violating his rights under the United States Constitution and the laws of the Commonwealth of Virginia.

## JURISDICTION AND VENUE

10.   This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

11.   This Court has supplemental jurisdiction over Plaintiff's claims under Virginia law pursuant to 28 U.S.C. § 1367.

12.   Venue lies in the Eastern District of Virginia under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action took place in this District, and the Plaintiff resides in this District.

## PARTIES

13.   Plaintiff Curtis J. Garrett is and was at all times relevant to the events alleged in this Complaint a citizen of the Commonwealth of Virginia. He was incarcerated at Sussex I State Prison at the time of the incident, in which canines were used to attack him while he was alone in his cell. On or around January 31, 2019, Mr. Garrett was transferred to Wallens Ridge State Prison. Both prisons are operated by VDOC.

14.   Defendant Canine Officers Franklin and Shy (collectively, "Canine Officers") are corrections officers and members of the Patrol Canine Team at Sussex I Prison, and served in those capacities on December 25, 2018. According to VDOC Operating Procedure 435.3, the Patrol Canine Team consists of trained corrections officers and their canines, which are trained to assist in maintaining security, custody, and control of prisoner populations.

15.   Defendant Doe 2 is the Institutional Canine Sergeant at Sussex I Prison and served in that capacity on December 25, 2018. In his capacity as Sussex I's Canine Sergeant, Defendant Doe 2 provides support to and oversees the canine officers at Sussex I, including the Patrol Canine Team, and is responsible for ensuring that the Canine Unit at Sussex I complies with all policies

applicable to the use of force and canines. Defendant Doe 2 receives all Canine Bite Reports for any incidents in Sussex I that result in a canine bite and must be notified immediately of the incident under VDOC Operating Procedures. He is sued in his individual capacity.

16.   Defendant Doe 3 is a healthcare professional at Sussex I and as of December 25, 2018 and all times relevant to this Complaint, provided medical care to individuals housed in medical segregation and/or solitary confinement at Sussex I. Defendant Doe 3 was the attending nurse in Sussex I's Medical Department tasked with treating Mr. Garrett. He/she is sued in his/her individual capacity.

17.   Defendant Doe 4 is a healthcare professional at Wallens Ridge and as of January 31, 2019 and all times relevant to this Complaint provided medical care to individuals housed in medical segregation and/or solitary confinement at Wallens Ridge. Defendant Doe 4 was responsible for providing treatment to Mr. Garrett while he was housed in medical segregation at Wallens Ridge. He/she is sued in his/her individual capacity.

18.   Defendant Doe 5 is a healthcare professional and as of December 25, 2018 and all times relevant to this Complaint served as the Head Nurse at Sussex I. Defendant Doe 5 was responsible for overseeing the on-duty healthcare personnel, including Doe 3, who were providing medical care to individuals housed in medical segregation and/or solitary confinement at Sussex I. He/she is sued in his/her individual capacity.

19.   Defendant Doe 6 is a healthcare professional and as of January 31, 2019 and all times relevant to this Complaint served as the Head Nurse at Wallens Ridge. Defendant Doe 6 was responsible for overseeing the on-duty healthcare personnel, including Doe 4, who were providing medical care to individuals housed in medical segregation and/or solitary confinement at Wallens Ridge. He/she is sued in his/her individual capacity.

20.   Defendant Warden Israel Hamilton is employed by VDOC as Warden and Facility Unit Head of Sussex I Prison and held such position on December 25, 2018 and at all times relevant to this Complaint. As Warden, Hamilton is tasked with supervising daily operational activities and ensuring staff compliance with VDOC policies and procedures, training Sussex I's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility. He is sued in his individual capacity.

21.   Defendant Warden Carl Manis was employed by VDOC as Warden and Facility Unit Head of Wallens Ridge and held such position on January 31, 2019 and at all times relevant to this Complaint. As Warden, Defendant Manis was tasked with supervising daily operational activities and ensuring staff compliance with VDOC policies and procedures, training Wallens Ridge's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility. He is sued in his individual capacity.

22.   Defendant Harold W. Clarke is the Director of VDOC and serves as the official governing authority for VDOC. As such, he was responsible for the custody and care of Mr. Garrett while he was incarcerated in Sussex I and Wallens Ridge State Prisons within VDOC and also had authority under Virginia law to transfer Mr. Garrett to any state or local correctional facility in the Commonwealth. Defendant Clarke oversees all employees in VDOC and has the authority to establish, alter, and implement all policies and procedures within VDOC. He had a clearly established, non-delegable constitutional duty not to be deliberately indifferent to the health and well-being of the prisoners confined within correctional facilities in the Commonwealth. At all times relevant to the subject matter of this litigation, Defendant Clarke was acting under color of

6

state law in his capacity as Director of VDOC. He is sued in his individual capacity and his official capacity for declaratory relief.

23.     Defendant A. David Robinson is the Chief of Corrections Operations for VDOC and held such position on December 25, 2018 and at all times relevant to this Complaint. In his capacity as Chief of Corrections Operations, Defendant Robinson leads VDOC facilities and is responsible for reviewing and approving the policies that govern the conduct of VDOC officers, including the policies concerning the use of force and use of canines described herein, as well as the policies concerning managing offenders with disabilities, and the provision of medical care. He is sued in his individual capacity and his official capacity for declaratory relief.

24.     Defendant William Barbetto is the Virginia Statewide Canine Program Coordinator for VDOC and held such position on December 25, 2018 and at all times relevant to this Complaint. In his capacity as a Statewide Canine Program Coordinator, Defendant Barbetto coordinates training and field operations and provides leadership and guidance to the VDOC Canine Program. Defendant Barbetto also holds responsibility for reviewing and approving the policies that govern the conduct of VDOC officers in the Canine Program, including the policies concerning the use of canines described herein. He receives all Canine Bite Reports for any incident in a VDOC facility involving a canine bite and must be notified immediately of the incident under VDOC Operating Procedures. He is sued in his individual capacity and his official capacity for declaratory relief.

25.     Defendant Steve Herrick is the Health Services Director of VDOC and held such position as of December 25, 2018 and at all times relevant to this Complaint. In that capacity, Defendant Herrick exercises direct day-to-day supervisory authority over the provision of medical

care services to prisoners incarcerated in VDOC facilities, including Sussex I and Wallens Ridge. He is sued in his individual capacity and his official capacity for declaratory relief.

26.     Defendant Doe 7 is a Regional Healthcare Administrator at VDOC and held such position as of December 25, 2018 and at all times relevant to this Complaint. In that capacity, Defendant Doe 7 provides clinical supervision to VDOC healthcare staff and supervises VDOC healthcare staff in the nursing specialty within his/her region, which includes Sussex I. Further, Defendant Doe 7 approves proposed disciplinary measures for healthcare staff within his/her region when there is a violation of policy regarding clinical care or healthcare management. He/she is sued in his/her individual capacity and official capacity for declaratory relief.

27.     Defendant Doe 8 is a Regional Healthcare Administrator at VDOC and held such position as of January 31, 2019 and at all times relevant to this Complaint. In that capacity, Defendant Doe 8 provides clinical supervision to VDOC healthcare staff and supervises VDOC healthcare staff in the nursing specialty within his/her region, which includes Wallens Ridge. Further, Defendant Doe 7 approves proposed disciplinary measures for healthcare staff within his/her region when there is a violation of policy regarding clinical care or healthcare management. He/she is sued in his/her individual capacity and official capacity for declaratory relief.

28.     Defendant Doe 9 is the Chief Nurse for VDOC and held such position as of December 25, 2018 and at all times relevant to Complaint. In that capacity, Defendant Doe 9 provides clinical supervision to VDOC healthcare nursing staff and has primary responsibility for staffing and personnel with the nursing specialty. He/she is sued in his/her individual capacity and official capacity for declaratory relief.

29.     Defendant Barry Marano is the Americans with Disabilities Act Coordinator for VDOC and held such position as of December 25, 2018 and at all times relevant to this Complaint.

In that capacity, Defendant Marano serves as the authority on all issues related to offenders with disabilities, reasonable accommodations, and the application of VDOC policies concerning the management of prisoners with disabilities, which require that all VDOC staff complete mandatory Americans with Disabilities Act ("ADA") training and receive instruction related to the provisions of accommodations for prisoners with disabilities. He is sued in his individual capacity and official capacity for declaratory relief.

30.    Defendant Doe 10 is the Americans With Disabilities Act Coordinator for Wallens Ridge and held such position as of January 31, 2019 and at all times relevant to this Complaint. In that capacity, Defendant Doe 10 reviews offender requests for reasonable accommodations and makes determinations on such requests. He/she is sued in his/her individual capacity.

31.    Defendant Commonwealth of Virginia (the "Commonwealth"), through Defendant VDOC, operates both Sussex I and Wallens Ridge, two level-five security state prisons in Virginia. Mr. Garrett was confined in Sussex I on the date of the incident, December 25, 2018, until he was transferred to Wallens Ridge State Prison on or around January 31, 2019. Mr. Garrett was then confined in Wallens Ridge until his release on May 20, 2019.

32.    Through VDOC, Sussex I and Wallens Ridge receive and benefit from federal financial assistance as that term is used in 29 U.S.C. § 794, including through the Prison Rape Elimination Act, 34 U.S.C. § 30301, and other sources.

33.    Defendant VDOC is being sued for damages under the ADA.

34.    Defendants Clarke, Robinson, Barbetto, Hamilton, Manis, Franklin, Shy, Herrick, Defendant Marano, and Defendant Does 2-10 are being sued for damages under Section 1983 in their individual capacities.

9

35.    The "Doe Defendants" in this matter are Sussex I, Wallens Ridge, and VDOC employees whose identities are not presently known to Mr. Garrett but were active participants in the denial of Mr. Garrett's rights, including his Eighth Amendment right to be free from cruel and unusual punishment. The identities of these Defendants will be pursued in discovery, and these Defendants may be added in their individual and official capacities as appropriate.

<center>**FACTUAL ALLEGATIONS**</center>

*Virginia's Policy in Using Canines to Control Prisoners*

36.    VDOC operates a statewide Canine Program, the structure and function of which is defined by VDOC Operating Procedure 435.3. The very first paragraph of that Operating Procedure makes clear that one of the primary goals of the Department of Corrections' Canine Program is to allow the use of canines to assist officers "in control of offenders." That Operating Procedure, signed by Defendant Robinson as Chief of Corrections Operations, further makes clear that Defendant Barbetto, as Statewide Canine Program Coordinator, maintains responsibility over both the Canine Program Team policies and its individual officers.

37.    Although the United States Constitution prohibits the use of excessive force against prisoners and VDOC's own policies, including Operating Procedure 420.1, purport to restrict the use of force "only as a last resort," the use of canines to attack prisoners in VDOC facilities is systemic and has led to severe physical and psychological injuries in prisons. Among the many ways, VDOC officers deploy canines against prisoners during cell extractions, which involve the forcible removal of prisoners from his or her cell.[1]

---

[1]  Human Rights Watch, *Cruel and Degrading: The Use of Dogs for Cell Extractions in U.S. Prisons* (October 9, 2006), https://www.hrw.org/report/2006/10/09/cruel-and-degrading/use-dogs-cell-extractions-us-prisons.

38.    The use of unmuzzled canines by prison officers as a means of forcing and intimidating a prisoner to voluntarily leave his cell has been widely recognized as an extreme, brutal, and unnecessary tactic. As Kathleen Dennehy, then-Commissioner of the Massachusetts Department of Correction, succinctly explained when prohibiting the use of canines for cell extractions: "[t]here are other ways to compel inmates to cuff up than sending in an animal to rip his flesh."[2] Indeed, many corrections experts recognize "the notion that dogs are different; they cannot simply be considered as another way of exercising force over a prisoner; that there is something inherently troubling about the use of a trained attack dog to bite prisoners."[3]

39.    The canines used in these attacks are no ordinary dogs. Canines used by officers to inflict force are bred and trained to bite hard and bite multiple times, inflicting wounds that, according to experts and medical researchers, are more akin to shark attacks than the average dog bite.[4] In many instances, those inflicted with such wounds experience permanent nerve damage and in some cases, even death.[5] And even when trained, these canines do not always stop biting when ordered to do so, increasing the likelihood of prolonged attacks and even greater injury from the manual efforts required to pry the canines away.[6]

40.    Recognizing the real and often severe dangers of engaging canines to bite or restrain prisoners, many states have prohibited or severely restricted the use of attack dogs in the

---

[2]  *Id*.

[3]  *Id*.

[4]  The Marshall Project, *We Spent A Year Investigating Police Dogs. Here Are Six Takeaways* (October 2, 2020), https://www.themarshallproject.org/2020/10/02/we-spent-a-year-investigating-police-dogs-here-are-six-takeaways.

[5]  *Id.*

[6]  *Id.*; *see also* Christy Lopez, *Don't overlook one of the most brutal and unnecessary parts of policing:    Police    dogs*,    Washington    Post    (July    6,    2020), https://www.washingtonpost.com/opinions/2020/07/06/police-dogs-are-problem-that-needs-fixing/.

confinement setting.[7] In fact, in the wake of Abu Ghraib and the reports that canines had been used to harass, threaten, and assault detainees, the United States Armed Forces revised their policy on the use of Military Working Dogs to expressly prohibit the use of canines in guarding detainees and military prisoners abroad or as a means of intimidation or coercion in interrogations.[8]

41.    In particular, many states prohibit the use of canines in cell extractions, and even in the states that permit the use of canines for extractions on paper, the tactic is used rarely, if at all.[9] As Disability Rights Oregon noted, "[n]o other known country authorizes the use of dogs to attack inmates who do not voluntarily leave their cells."[10] And, just last year, following a high-profile case where Columbia County, Oregon jailers let loose a canine on an inmate with mental illness, Oregon passed a law prohibiting the use of canines to extract prisoners from their cells in both adult and youth correctional facilities.[11]

42.    Nevertheless, Virginia remains one of the few states that routinely utilizes canines to forcibly and violently remove prisoners from their cells. The Operating Procedures issued by VDOC and approved by Defendants Clarke, Robinson, and Barbetto—in particular Operating Procedure 435.3, 420.1, and 420.2—allow officers to engage canines to bite or physically restrain prisoners to remove them from their cells. While VDOC Operating Procedures purport to restrict

---

[7] Human Rights Watch, *Cruel and Degrading: The Use of Dogs for Cell Extractions in U.S. Prisons* (October 9, 2006), https://www.hrw.org/report/2006/10/09/cruel-and-degrading/use-dogs-cell-extractions-us-prisons.

[8] U.S. DEPT OF THE ARMY, INSTR. 190-12, MILITARY WORKING DOG PROGRAM ch. 7-4.b (October 23, 2019).

[9] *Id.*; *see also*, The Appeal, *Things We Didn't Know Needed to be Banned: Using Attack Dogs on Incarcerated People*, (2019), https://theappeal.org/things-we-didnt-know-needed-to-be-banned-using-attack-dogs-on-incarcerated-people/.

[10] Disability Rights Oregon, *'You are going to get bitten': Columbia County Jail's Use of Canines to Intimidate and Control Inmates* (Fall 2018), https://olis.leg.state.or.us/liz/2019R1/Downloads/CommitteeMeetingDocument/161623.

[11] Ore. S.B. 495.

canine deployment and other use of force "only as a last resort" in instances "of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control," as many states have already recognized, there is never a legitimate need in a cell extraction to use a canine to attack or restrain a prisoner.

43.   Operating Procedure 435.3, Operating Procedure 420.1, and Operating Procedure 420.2 do not provide meaningful guidance or restrictions on the use of canines because, among other reasons, the terms "justifiable" and "last resort" are vague and subject to individual interpretation. As a result, the use of canines to attack prisoners under the guise of managing behavior in VDOC facilities is systemic. In many cases, including Mr. Garrett's, canines are engaged in excessive, malicious, and wholly egregious manners in violation of the prisoner's constitutional rights. Prisoners in facilities throughout the state have described canine attacks similar to the one experienced by Mr. Garrett. They report that canines are often permitted to bite, drag, or otherwise maul prisoners who are already complying with corrections officer orders or who are simply standing in their cells. Often, these prisoners are in compromising positions—facedown, arms out—with little ability to reduce the physical damage from the canine's bites. They experience physical injuries, including deep lacerations, disfigurement, and permanent nerve damage, and, perhaps worse, severe mental injuries from these attacks.

44.   Moreover, VDOC policies and practices allow, either expressly or through failure to provide sufficient training and discipline, to deploy canines against prisoners in a manner wholly inconsistent with accepted guidance on patrol canines. On information and belief, VDOC policies and practices permit, or fail to prevent, canine officers from engaging their canines to bite prisoners off-leash, deploying their canines while simultaneously grabbing or touching the prisoner, and deploying canines before sufficient time is provided for a prisoner to comply with officer orders.

VDOC's failure to adhere to the widely recognized standards for canine deployment both facilitates and exacerbates the systemic problem of canine attacks in VDOC facilities.

45.    The use of canines for cell extractions is unnecessary and excessive. Given the pervasive nature of the use, and abuse, of the tactic in VDOC facilities, VDOC policies must be changed to prohibit the use of canines as a means of, or in any way connected to, attacking or physically engaging with prisoners during cell extractions. At the very least, VDOC policies and procedures must be revised so that they provide meaningful guidance for officers on the appropriate instances in which a canine may be engaged as a means of force and so that the policies comport with accepted standards for canine deployment.

**_Defendants Franklin's and Shy's Malicious Assault and Deployment of Their Patrol Canines_**

46.    On December 25, 2018, Mr. Garrett was housed at Sussex I, Building 3. After a brief altercation involving a broom handle,   Mr. Garrett retreated to his assigned cell 3C38, closing the door behind him.

47.    Shortly after closing his cell door, Mr. Garrett saw the Patrol Canine Unit—comprised of Defendant Franklin and Defendant Shy, and two dogs—outside his cell window. Mr. Garrett immediately turned around to present his hands behind his back to be cuffed.

48.    Upon information and belief, VDOC policy requires cell extractions to be performed by a trained cell extraction team and recorded by a corrections officer with a camcorder. Neither Canine Officer recorded the cell extraction with a camcorder or other video recording device.

49.    VDOC Operating Procedure 420.1 further provides that the use of force, including through the engagement of canines, is limited to instances "of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control, and then only as a last resort." Force may never be used for "vindictive or retaliatory purposes" and is "never

14

justifiable as punishment." Excessive force is any force that "is beyond what is reasonably required to prevent harm or to control a particular situation or is not justified by the circumstances."

50.     Further, VDOC Operating Procedure 420.3 mandates that any control measures taken to manage prisoner behavior "must be appropriately matched to the seriousness of the behaviors they are intended to control." That Operating Procedure further explains that "controls must not be applied any longer than is necessary to manage the targeted behavior" and cautions that "use of excessive controls may be equated to the use of excessive force."

51.     However, without warning or provocation, Defendants Franklin and Shy entered the cell and unleashed their canines, ordering them to attack Mr. Garrett. The two canines bit Mr. Garrett's left arm and right leg while the two Officers punched and kicked Mr. Garrett repeatedly. Given that Mr. Garrett had already turned around and presented his hands behind his back to be cuffed and taken from his cell, these acts went well beyond what was "reasonably required" to control the situation.

52.     Mr. Garrett collapsed to the ground under the force of the Patrol Canine Unit's attack. Defendant Franklin and Defendant Shy pulled Mr. Garrett up without ordering the canines to release their hold on Mr. Garrett's arm and leg. The canines sank their teeth deeper into Mr. Garrett's arm and leg when he was pulled up into the air, causing them to hang in the air, still attached to Mr. Garrett by their teeth as he was lifted.

53.     While the canines' jaws clenched down on Mr. Garrett's left arm and right leg, Defendants Franklin and Shy slammed Mr. Garrett's body against the wall of his cell. The Officers proceeded to cuff Mr. Garrett's hands behind him.

54.     Severely injured from the attack, Mr. Garrett was transported to the emergency department at Southside Regional Medical Center, where an attending physician disinfected the

bite wounds and gave him stiches.   The wound, however, was deep and left open to drain and heal.

55.   Mr. Garrett suffered extensive nerve damage caused by the canine attack. Because of this damage, Mr. Garrett had no sensation or control over his dominant left hand. Following the attack, Mr. Garrett could no longer write with his hand or engage in normal activities that required opening or clenching his hand to its fullest extent. Mr. Garrett was unable to extend his left arm fully and suffered sharp, shooting pain throughout the left side of his body emanating from the canine wound.

56.   Due to his extended nerve damage in his right leg from the canine attack, Mr. Garrett's right leg became a "dead leg" that was almost completely numb. Bearing weight on his right foot caused searing pain that radiated up his leg.

57.   The hospital provided Mr. Garrett with a cane to assist with ambulation and balance so that he could avoid bearing weight on his injuries.

***Defendants Kept Mr. Garrett in Solitary Confinement and Refused to Provide Proper Medical Care***

58.   VDOC Operating Procedure 720.1 mandates that prisoners must have "unimpeded access to health care," including "adequate pain management for acute and chronic conditions." Under that policy, the Facility Unit Heads, in conjunction with the facility Health Authority, are tasked with ensuring that prisoners have "timely access to, and are provided adequate health care services." The medical care Mr. Garrett received for the injuries he suffered from Defendant Franklin's and Defendant Shy's attack was far from adequate. Indeed, after returning to Sussex I, he received almost no medical treatment at all, exacerbating his injuries, his physical pain, and his deep mental anguish.

16

59.     Upon discharge, the attending physician at Southside Regional Medical Center prescribed that Mr. Garrett be brought to the Sussex I Medical Department for wound care, as the wound was left partially open to drain due to its severity.   The physician prescribed a 10-day course of antibiotics and pain killers as needed. The attending physician further ordered that the stiches Mr. Garrett had received be removed within 7-10 days, and that he be brought back to the emergency room should his symptoms require.

60.     The doctor also ordered that Mr. Garrett return for a follow-up visit a few weeks following the incident to ensure that his wounds were healing properly and that he be taken to an orthopedic surgeon or specialist so that he or she could assess the nerve and other damage. On information and belief, the attending physician's orders were provided to the healthcare staff at Sussex I, including Doe 3, and were, or should have been, made available to the other healthcare staff charged with providing medical care to prisoners in the facility.

61.     However, upon his return to Sussex I from Southside Regional Medical Center, Mr. Garrett was not allowed to return to the hospital for follow-up treatment, taken to see an orthopedic surgeon, or was he brought to the Medical Department as instructed by the discharge orders. Instead, he was removed from the general population and placed in solitary confinement for approximately five weeks with almost no medical care.

62.     While in solitary confinement, no medical staff or personnel agreed to change Mr. Garrett's bandages, despite his repeated requests for assistance and pleas to visit the Medical Department per the attending physician's orders.

63.     Unable to open his left hand or extend his left arm due to extensive nerve damage, Mr. Garrett was unable to properly change his dressings himself.

17

64.   As a result, Mr. Garrett's wounds on his leg and arm began to fester and discharge greenish fluid.

65.   On December 29, 2018, Mr. Garrett submitted an informal grievance to Sussex I prison officials informing them that he had not had his bandages changed for two days, that his "wounds [were] bleeding," and that he was "in major pain."

66.   On January 2, 2019, Mr. Garrett submitted an emergency grievance to Sussex I prison officials informing them again that he had not had his bandages changed for two days, despite the fact that his bandages needed to be changed daily, and that he was bleeding and "in major pain."

67.   On January 7, 2019, Mr. Garrett submitted an informal complaint to Sussex I prison officials informing them that he had not been brought to medical to have his wounds cleaned and his bandages changed since December 28, 2018. Mr. Garrett requested to be transferred to the medical unit at Powhatan Corrections so that he could receive proper care for his still-open and now clearly infected wounds.

68.   On January 8, 2019 Mr. Garrett submitted two emergency grievances to Sussex I prison officials informing them that his bandages were not being changed and that that his wounds were in pain and discharging.

69.   After close to another week in solitary confinement without having his wounds cleaned or bandages changed, Mr. Garrett began to vomit and experienced physical weakness. He stopped eating. As his infection progressed, the skin surrounding Mr. Garrett's wounds began to yellow.

70.   On January 15, 2019, Mr. Garrett submitted two emergency grievances to Sussex I prison officials informing them that his leg was bleeding and in major pain and that his wounds were discharging puss and needed to be cleaned.

18

71.   On January 17, 2019, Mr. Garrett submitted an emergency grievance to Sussex I prison officials informing them that he had not had his bandages changed or his wounds cleaned in over a week and that his wounds were bleeding and in pain.

72.   On January 19, 2019, Mr. Garrett submitted another emergency grievance to Sussex I prison officials informing them that his bandages still had not been changed and had "turned hard from the old blood." The grievance further stated his leg was "burning," swelling up, and discharging puss.

73.   Desperate for medical care after nearly two weeks without any assistance, Mr. Garrett pretended to be dead in his cell, hoping that it would attract attention. It was only once Mr. Garrett pretended to be dead that Doe 3 entered the cell to provide assistance.

74.   On information and belief, Doe 3 was the attending nurse in Sussex I's Medical Department tasked with treating Mr. Garrett during his time in solitary confinement. Despite receiving Mr. Garrett's discharge instructions, Doe 3 neglected to properly care for his injuries in accordance with the physician's instructions or provide any real care at all.

75.   Only after Mr. Garrett pretended to be dead did Doe 3 bring him to the Sussex I Medical Department and prescribed him antibiotics for his infection. Doe 3 then returned Mr. Garrett to his solitary cell.

76.   Despite knowing that Mr. Garrett's wounds had been infected, Doe 3 continued to deny Mr. Garrett the medical care required by his condition, refusing to change Mr. Garrett's bandages daily or to clean his wounds.

77.   After another week in isolation without daily bandage changes and wound cleaning— and despite the course of antibiotics—Mr. Garrett's wounds became re-infected.

78. On January 25 and 26, 2019, Mr. Garrett submitted two emergency grievances to Sussex I prison officials informing them that he had not been provided his nerve pain medication prescribed by the doctor and that as a result he was "in major pain." His grievances also stated that his wounds continued to bleed profusely.

79. Defendant Hamilton was aware that the healthcare staff at Sussex I, including Doe 3, were not providing Mr. Garrett with the medical care prescribed through the numerous grievances submitted by Mr. Garrett, Defendant Hamilton's responsibility for training and supervising Sussex I staff, and Defendant Hamilton's review of Mr. Garrett's medical records to determine his eligibility for transfer. Nonetheless, Defendant Hamilton did not direct the Sussex I healthcare staff to provide Mr. Garrett the medical care prescribed by the attending physician at Southside Regional Medical Center or take any other action to ensure Mr. Garrett received adequate medical care.

80. Defendant Herrick was aware that the healthcare staff at Sussex I, including Doe 3, were not providing Mr. Garrett with the medical care prescribed through the numerous grievances submitted by Mr. Garrett and Defendant Herrick's direct day-to-day supervisory authority over the provision of medical care services to prisoners incarcerated in VDOC facilities, including Sussex I. Nonetheless, Defendant Herrick did not direct the Sussex I healthcare staff to provide Mr. Garrett the medical care prescribed by the attending physician at Southside Regional Medical Center or take any other action to ensure Mr. Garrett received adequate medical care.

81. Defendant Robinson was aware that the healthcare staff at Sussex I, including Doe 3, were not providing Mr. Garrett with the medical care prescribed through the numerous grievances submitted by Mr. Garrett and Defendant Robinson's responsibility to ensure VDOC healthcare staff provide adequate healthcare to prisoners within VDOC facilities, including Sussex I.

20

Nonetheless, Defendant Robinson did not direct the Sussex I healthcare staff to provide Mr. Garrett the medical care prescribed by the attending physician at Southside Regional Medical Center or take any other action to ensure Mr. Garrett received adequate medical care.

82. At approximately 2:00 a.m. on January 31, 2019, Mr. Garrett was removed from solitary confinement by Sergeant Moyer and placed in a police van. He was not allowed the opportunity to retrieve any of his belongings aside from his brown walking cane.

83. When Mr. Garrett asked where he was being transported, Sergeant Moyer replied that he was "being taken to the hospital."

84. Instead, Mr. Garrett was transferred to Wallens Ridge, a nonmedical facility located nearly 400 miles away on the border of Kentucky.

85. On information and belief, prisoners at Wallens Ridge in need of continued medical care such as daily wound cleaning and dressing changes are typically transferred to Sussex I, Greenville, Powhatan, or Deerfield facilities because Wallens Ridge lacks adequate medical facilities, supplies, and staffing for ongoing medical treatment.

86. Upon information and belief, Mr. Garrett's transfer to Wallens Ridge was approved by VDOC Director Harold Clarke and Sussex I Warden Israel Hamilton, even though they were apprised of Mr. Garrett's medical needs.

87. Now nearly a seven-hour drive from his family, Mr. Garrett was physically isolated from his mother, Myra Garrett, who had been advocating on his behalf for Sussex I to provide him proper medical treatment.

88. Mr. Garrett was housed in "medical segregation" in Wallens Ridge for approximately two weeks. For the first two days that he was held in medical segregation, he received minimal

treatment from Doe 4. On the third day, Mr. Garrett was told by Doe 4 that he would have to change his dressings himself going forward. As a result, Mr. Garrett developed another infection.

89. Mr. Garrett's denial of medical care is sadly not an isolated incident within VDOC facilities. Both before and after Mr. Garrett was attacked and denied medical care, prisoners in facilities throughout the state—including Sussex I and Wallens Ridge—reported numerous incidents on which they were denied medical care or provided inadequate medical care by VDOC healthcare staff. Like Mr. Garrett, many of these prisoners received inadequate medical care or no medical care for serious injuries and wounds suffered from being attacked by VDOC patrol canines attacks or from other physical assaults. In particular, VDOC medical staff failed to provide the prisoners with (a) appropriate pain medication, (b) an examination by a physician, (c) a prescribed follow-up examination by a specialist, (d) adequate dressings for the prisoners' wounds, or (e) any treatment at all. For example:

a) In October 2018, one VDOC prisoner was bitten by a VDOC patrol canine continuously for more than one minute on his buttocks, groin, and testicles. The prisoner received no pain medication for more than 80 days after the attack.

b) Another VDOC prisoner reported in March 2018 that he was denied any medical treatment for a broken jaw he suffered after being assaulted.

c) Another prisoner at Sussex I—who was lying on the floor while VDOC patrol canines attacked his cellmate—suffered a gaping wound in his right arm after being shot by VDOC officers with rubber bullets. Despite submitting multiple request forms and emergency grievances, this prisoner was not brought to see a medical professional.

d) Another prisoner at Wallens Ridge suffered severe wounds when a VDOC patrol canine bit his upper left thigh and VDOC officers beat him and slammed him onto the floor

repeatedly. The officers dragged the prisoner to the medical unit, but the nurses there merely wiped off his wounds and did not apply any dressings.

### Denial of Disability Accommodations

90. Once removed from medical segregation, Mr. Garrett was housed in general population in Wallens Ridge A-407. Mr. Garrett's ambulation was severely limited due to his injuries from the attack. Without his cane, Mr. Garrett was unable to bear weight on his right foot without excruciating pain and difficulty balancing.

91. When he first arrived at Wallens Ridge, the medical intake staff noted Mr. Garrett's difficulty walking and inability to bear weight on his leg. Nevertheless, prison staff confiscated Mr. Garrett's brown walking cane and failed to timely provide him with any ambulatory assistive devices that would have allowed him to be independently mobile.

92. Denied any ambulatory assistive devices, Mr. Garrett was forced to limp on the outermost edges of his right foot so as to avoid placing too much weight on this painful area. Without his cane, Mr. Garrett walked slowly and with great difficulty. Medical records from Wallens Ridge confirm that medical staff were aware of Mr. Garrett's limp and difficulty ambulating.

93. Mr. Garrett was prescribed the drug Cymbalta to address his acute nerve pain. On several occasions, he was unable to walk on his injured leg quickly enough to receive his daily pill from medical staff during the narrow timeframe in which medicine is dispersed at the facility.

94. In February 2019, Mr. Garrett submitted Form 801_F7 Reasonable Accommodation Request requesting that his meals be brought to his cell so that he did not have to hobble to the dining area to receive his food. Sergeants Rutherford and Thomas granted Mr. Garrett

accommodations for his disability by signing his request form to allow meals brought to his cell due to his inability to walk.

95.    Nevertheless, on April 8, 2019, Sergeant Rutherford reversed course and denied Mr. Garrett a breakfast meal due to his inability to walk to the "chow hall." When Mr. Garrett provided Sergeant Rutherford with the accommodation form that Sergeant Rutherford had signed two months prior, the Sergeant took the form from Mr. Garrett and denied him his meal. Sergeant Rutherford never returned Mr. Garrett's accommodation form.

96.    After Mr. Garrett submitted a grievance regarding his missed meal, Unit Manager J. Stallard stated in a formal response dated April 11, 2019 that the Medical Department had never found Mr. Garrett to need any such accommodations related to ambulation.

97.    Despite staff at Southside Regional Medical Center reissuing the prescription that Mr. Garrett be brought in for a follow-up appointment with a specialist and Mr. Garrett's repeated requests for the same, Mr. Garrett continued to be denied access to an orthopedic surgeon or specialist to address the severe nerve damage in his leg and arm resulting from the canine attack while at Wallens Ridge.

98.    On April 16, 2019, Mr. Garrett submitted an informal complaint to Wallens Ridge prison officials informing them that he had not been provided an appointment with a specialist to examine and treat his nerve damage. On May 9, 2019, Mr. Garrett submitted another grievance to Wallens Ridge prison officials informing them that he had still not been provided an appointment with a specialist to address his nerve damage.

99.    Defendant Manis was aware that the healthcare staff at Wallens Ridge, including Does 4-6, were not providing Mr. Garrett with the medical care prescribed through the numerous grievances submitted by Mr. Garrett and Defendant Manis's responsibility for training and

supervising Wallens Ridge staff. Nonetheless, Defendant Manis did not direct the Wallens Ridge healthcare staff to provide Mr. Garrett the medical care prescribed by the attending physician at Southside Regional Medical Center or take any other action to ensure Mr. Garrett received adequate medical care.

100. Defendant Herrick was aware that the healthcare staff at Wallens Ridge, including Does 4-6, were not providing Mr. Garrett with the medical care prescribed through the numerous grievances submitted by Mr. Garrett and Defendant Herrick's direct day-to-day supervisory authority over the provision of medical care services to prisoners incarcerated in VDOC facilities, including Wallens Ridge. Nonetheless, Defendant Herrick did not direct the Wallens Ridge healthcare staff to provide Mr. Garrett the medical care prescribed by the attending physician at Southside Regional Medical Center or take any other action to ensure Mr. Garrett received adequate medical care.

101. Defendant Robinson was aware that the healthcare staff at Wallens Ridge, including Does 4-6, were not providing Mr. Garrett with the medical care prescribed through the numerous grievances submitted by Mr. Garrett and Defendant Robinson's responsibility to ensure VDOC healthcare staff provide adequate healthcare to prisoners within VDOC facilities, including Wallens Ridge. Nonetheless, Defendant Robinson did not direct the Wallens Ridge healthcare staff to provide Mr. Garrett the medical care prescribed by the attending physician at Southside Regional Medical Center or take any other action to ensure Mr. Garrett received adequate medical care.

102. When Mr. Garrett was finally released in May 2019, he was forced to walk on his injured right leg without a cane for over half a mile to reach the transportation truck home.

103.  Defendants' refusal to accommodate Mr. Garrett's disability in violation of the law is part of a persistent pattern of failure to recognize prisoner disabilities or provide reasonable accommodations within VDOC prisons. Worse, as was true for Mr. Garrett, VDOC officers not only refused to comply with reasonable accommodations promised to prisoners; they have punished prisoners for behavior caused by their disabilities. For example:

a)  VDOC officers at Wallens Ridge placed a hearing impaired prisoner on cell restriction for not being able to hear "count time."

b)  Since August 15, 2017, VDOC officers have refused to use a message board installed to aid another hearing impaired prisoner.

c)  Multiple hearing impaired prisoners in VDOC facilities, including Wallens Ridge, have been denied the use of Text Telephones (or "TTYs").

d)  VDOC officers repeatedly failed to provide diapers to an elderly, obese prisoner with impaired mobility.

104.  VDOC officers' failure to provide the necessary accommodations not only impairs prisoners' lives while in VDOC facilities. It can have lasting effects beyond the prison walls.

105.  Since Mr. Garrett's release, his physical condition has not improved. Mr. Garrett has been informed by his doctor that he is not likely to regain feeling and mobility in his dominant left hand. He still walks with a crutch.

106.  Mr. Garrett's mental condition has deteriorated substantially since the attack, denial of medical care, and inhumane treatment at both Sussex I and Wallens Ridge. Sussex I psychiatric staff diagnosed Mr. Garrett with PTSD, and Wallens Ridge staff noted that he suffered from "major depression." These conditions continue to this day. He cannot sleep at night due to recurring

nightmares of the attack. He self-isolates in his room and at times panics because he thinks he hears dogs barking outside his door.

107. Mr. Garrett was institutionalized at Tucker Mental Institution on Wednesday, December 2, 2020 for a mental breakdown caused by trauma associated with the canine attack and its aftermath.

### Defendant Hamilton and Defendant Doe 2's Failure to Properly Supervise, Train, and Discipline Defendants Franklin's and Shy's Use of Force and Deployment of Their Canines

108. VDOC Operating Procedure 420.8 establishes guidelines for the control and management of prisoner behavior through behavior management and control techniques. That Operating Procedure mandates that any control measures taken "must be appropriately matched to the seriousness of the behaviors they are intended to control" and that "controls must not be applied any longer than is necessary to manage the targeted behavior."

109. Under VDOC Operating Procedure 420.1, the use of force, including through the engagement of canines, is limited to instances "of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control, and then only as a last resort." Any force that "is beyond what is reasonably required to prevent harm or to control a particular situation or is not justified by the circumstances" is deemed "excessive force." Force may never be used for "vindictive or retaliatory purposes" and is "never justifiable as punishment."

110. Pursuant to VDOC Operating Procedure 435.3, which permits canines to be deployed as a means of prisoner control, any incident involving a canine bite must be logged in a Canine Bite Report in the Dog Information Governance & Operation System (DINGO), and any injury must be photographed and included with the Canine Bite Report. Operating Procedure 435.3 further requires that all Bite Reports be delivered to the Statewide Canine Program Coordinator, Shift Commander, Administrative Duty Officer, and Facility Unit Head Israel Hamilton.

27

Additionally, the Operating Procedure mandates that the Statewide Canine Program Coordinator and Institutional Defendant Doe 2 are immediately notified whenever a canine bites a prisoner.

111. Accordingly, under Operating Procedure 435.3, Defendant Franklin and Defendant Shy were required to submit a Canine Bite Report, including a photograph of Mr. Garrett's injuries, to DINGO and immediately notify Statewide Canine Program Coordinator Defendant Barbetto and Institutional Defendant Doe 2 of the incident with Mr. Garrett. Defendant Franklin's and Defendant Shy's Canine Bite Report would then be forwarded to, among others, Statewide Canine Program Coordinator Defendant Barbetto, Defendant Hamilton, and Institutional Defendant Doe 2.

112. On information and belief, Defendant Franklin, Defendant Shy, and other canine officers at Sussex I have frequently engaged in excessive force, assaulting non-threatening prisoners with their attack canines. Assuming canine officers at Sussex I complied with VDOC policies, Defendant Hamilton, Defendant Doe 2, and Statewide Canine Program Coordinator Defendant Barbetto knew or should have known about each of these incidents.

113. Pursuant to VDOC's internal rules, including Operating Procedures 010.1, 135.1, and 135.2, Defendant Hamilton is responsible for supervising Sussex I, training Sussex I's corrections officers, and disciplining officers who violate VDOC rules.

114. Under VDOC Operating Procedure 435.3, Defendant Doe 2 is responsible for supervising the Sussex I patrol canine program, including providing guidance and discipline.

115. Upon information and belief, Defendant Hamilton and Defendant Doe 2 failed to properly (a) investigate Defendant Franklin's and Defendant Shy's excessive use of force, including the deployment of their canines on December 25, 2018; (b) discipline Defendant Officers for their actions or failure to intervene in connection with that incident of brutality; and, (c) verify

that the canines and/or canine officers were sufficiently trained in accordance with VDOC Operating Procedure, Canine Training Academy criteria, or other widely accepted canine officer and canine training standards.

116. As a result of their investigative and administrative inaction, Defendant Hamilton and Defendant Doe 2 have encouraged Defendant Officers and other corrections officers at Sussex I to believe that their excessive use of force, deployment of their canines to attack prisoners, and/or failure to intervene to prevent the use of canines to abuse prisoners was permissible and would not be punished.

117. It was foreseeable that Defendant Hamilton's and Defendant Doe 2's failure to properly train, supervise, or discipline Defendant Franklin, Defendant Shy, and other corrections officers at Sussex I would lead to prisoners being bitten and mauled by patrol dogs even when they posed no threat to those around them.

118. It was also foreseeable that Defendant Hamilton's and Defendant Doe 2's failure to properly train, supervise, or discipline Defendant Franklin, Defendant Shy, and other corrections officers at Sussex I would lead to prisoners being kicked, punched, and slammed into walls even when they posed no threat to those around them.

### *VDOC Official's Failure to Properly Supervise, Train, and Discipline Defendant Franklin's and Defendant Shy's Deployment of Their Canines*

119. Under VDOC Operating Procedure 435.3, Statewide Canine Program Coordinator, Defendant Barbetto, coordinates training and field operations for the Virginia Canine Program. Pursuant to this Operating Procedure, Defendant Barbetto must be notified immediately and receive a Canine Bite Report in DINGO of any incidents that result in a canine bite.

120.  As Director of VDOC, Defendant Clarke serves as the official governing authority for VDOC and holds ultimate responsibility for training, supervising, and disciplining VDOC corrections officers.

121.  As the Chief of Corrections Operations for VDOC, Defendant Robinson leads VDOC facilities and holds responsibility for training, supervising, and disciplining VDOC corrections officers.

122.  Upon information and belief, Defendant Clarke, Defendant Robinson, and Defendant Barbetto failed to properly (a) investigate Defendant Franklin's and Defendant Shy's excessive use of force, including the deployment of their canines on December 25, 2018; (b) discipline Defendant Franklin and Defendant Shy for their actions or failure to intervene in connection with that incident of brutality; (c) train corrections officers on the proper use of canines; and (d) verify that the canines and/or canine officers were sufficiently trained in accordance with VDOC Operating Procedure, Canine Training Academy criteria, or other widely accepted canine officer and canine training standards.

123.  As a result of their investigative and administrative inaction, Defendant Clarke, Defendant Robinson, and Defendant Barbetto tacitly encouraged, and continue to encourage, Defendant Franklin, Defendant Shy, and other canine officers to believe that their use of force, use of canines, or failure to intervene to prevent the use of canines to abuse prisoners was permissible and would not be punished.

124.  It was foreseeable that Defendant Clarke, Defendant Robinson, and Defendant Barbetto's failure to properly train, supervise, or discipline Defendant Franklin, Defendant Doe 2, and other officers would lead to prisoners being bitten and mauled by patrol dogs even when they posed no threat to those around them.

125.  It was also foreseeable that Defendant Clarke, Defendant Robinson, and Defendant Barbetto's failure to properly train, supervise, or discipline Defendant Franklin, Defendant Shy, and other officers would lead to prisoners being kicked, punched, and slammed into walls even when they posed no threat to those around them.

### Defendants Doe 5 and Hamilton's Failure to Properly Supervise, Train, and Discipline Doe 3's Denial of Healthcare

126.  VDOC Operating Procedure 701.1 establishes the organization, responsibility, and authority of the Health Services Unit within VDOC and defines the relationship, responsibilities, and duties of those within the Health Services Unit.

127.  Pursuant to Operating Procedure 701.1, Defendant Doe 5, as Head Nurse at Sussex I, was responsible for overseeing the on-duty healthcare personnel, including Doe 3, who were providing medical care to individuals housed in medical segregation and/or solitary confinement at Sussex I. Further, upon information and belief, in his/her capacity as Head Nurse, Defendant Doe 5 serves as the Health Authority for Sussex I and is responsible for the administration of the Medical Department within that facility, including the day-to-day operations of the medical services program. The Health Authority for Sussex I is responsible under Operating Procedure 701.1 for all nurses within the facility and has responsibility for training and discipline of Medical Department staff.

128.  Pursuant to VDOC's internal rules, including Operating Procedures 010.1, 135.1, and 135.2, Defendant Hamilton holds responsibility for supervising Sussex I, training Sussex I's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility. Further, under Operating Procedure 720.1, Defendant Hamilton bears responsibility for ensuring that all prisoners "have timely access to, and are provided adequate health care services."

129.   Upon information and belief, Defendant Doe 5 and Defendant Hamilton, among other things, failed to properly (a) supervise Doe 3's provision—or lack thereof—of medical care to Mr. Garrett; (b) ensure that Doe 3 was adequately providing Mr. Garrett medical care as ordered by the discharging physician at Southside Regional Medical Center; (c) train Doe 3 on the adequate level of medical attention necessary for the severity Mr. Garrett's injuries; (d) train Doe 3 on his/her obligations under the United States Constitution concerning deliberate indifference to the serious medical needs of prisoners; (e) investigate Doe 3's failure to provide medical care to Mr. Garrett; and (f) discipline Doe 3 for his/her failure to provide medical care to Mr. Garrett.

130.   As a result of his/her investigative and administrative inaction, Defendant Doe 5 and Defendant Hamilton tacitly encouraged, and continue to encourage, Defendant Doe 3 and other healthcare providers in the Medical Department at Sussex I to believe that their denial of healthcare, including failure to follow outside care provider instructions and deliberate indifference to the serious medical needs of prisoners were permissible and would not be punished.

131.   It was foreseeable that Defendant Doe 5 and Defendant Hamilton' failure to properly train, supervise, or discipline Defendant Doe 3 and other healthcare providers in the Medical Department would lead to prisoners failing to receive adequate, or even any, medical care.

### *Defendants Doe 6 and Manis's Failure to Properly Supervise, Train, and Discipline Doe 4's Denial of Healthcare*

132.   Pursuant to Operating Procedure 701.1, Defendant Doe 6, as Head Nurse at Sussex I, was responsible for overseeing the on-duty healthcare personnel, including Doe 4, designated under his/her supervision who were providing medical care to individuals housed in medical segregation and/or solitary confinement at Wallens Ridge. Further, upon information and belief, in his/her capacity as Head Nurse, Defendant Doe 6 serves as the Health Authority for Wallens

Ridge. The Health Authority is responsible for the day-to-day operations of the medical services program and has responsibility for training and disciplining the Medical Department staff.

133. Pursuant to VDOC's internal rules, including Operating Procedures 010.1, 135.1, and 135.2, Defendant Manis held responsibility for supervising Wallens Ridge, training the Wallens Ridge's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility. Further, under Operating Procedure 720.1, Defendant Manis bore responsibility for ensuring that all prisoners "have timely access to, and are provided adequate health care services."

134. Upon information and belief, Defendant Doe 6 and Defendant Manis, among other things, failed to properly (a) supervise Doe 4's provision—or lack thereof—of medical care to Mr. Garrett; (b) ensure that Doe 4 was adequately providing Mr. Garrett medical care as ordered by the discharging physician at Southside Regional Medical Center; (c) train Doe 4 on the adequate level of medical attention necessary for the severity Mr. Garrett's injuries; (d) train Doe 4 on his/her obligations under the United States Constitution concerning deliberate indifference to the serious medical needs of prisoners; (e) investigate Doe 4's failure to provide medical care to Mr. Garrett; and (f) discipline Doe 4 for his/her failure to provide medical care to Mr. Garrett.

135. As a result of his/her investigative and administrative inaction, Defendant Doe 6 and Defendant Manis tacitly encouraged, and continue to encourage, Defendant Doe 4 and other healthcare providers in the Medical Department at the Wallens Ridge to believe that their denial of healthcare, including failure to follow outside care provider instructions and deliberate indifference to the serious medical needs of prisoners were permissible and would not be punished.

136.  It was foreseeable that Defendant Doe 6 and Defendant Manis's failure to properly train, supervise, or discipline Defendant Doe 4 and other healthcare providers in the Medical Department would lead to prisoners failing to receive adequate, or any, medical care.

***VDOC Official*'s *Failure to Properly Supervise, Train, and Discipline Doe 3's and Doe 4's Failure to Provide Medical Care***

137.  Pursuant to Operating Procedure 701.1, Defendant Doe 7, in his/her capacity as Regional Healthcare Administrator, supervises VDOC healthcare nursing staff, including Doe 3, in the region including Sussex I. As provided in that Operating Procedure, when there is a violation of policy regarding clinical care or healthcare management within the region, Defendant Doe 7 is responsible for approving proposed disciplinary measures for healthcare staff.

138.  Upon information and belief, Defendant Doe 7 failed to properly (a) supervise Doe 3's provision—or lack thereof—of medical care to Mr. Garrett; (b) ensure that Doe 3 was adequately providing Mr. Garrett medical care as ordered by the discharging physician at Southside Regional Medical Center; (c) train Doe 3 on the adequate level of medical attention necessary for the severity Mr. Garrett's injuries; (d) train Doe 3 on his/her obligations under the United States Constitution concerning deliberate indifference to the serious medical needs of prisoners; (e) investigate Doe 3's failure to provide medical care to Mr. Garrett; and (f) discipline Doe 3 for his/her failure to provide medical care to Mr. Garrett.

139. As a result of his/her investigative and administrative inaction, Defendant Doe 7 tacitly encouraged, and continue to encourage, Defendant Doe 3 and other healthcare providers at Sussex I to believe that their denial of healthcare, including failure to follow outside care provider instructions and deliberate indifference to the serious medical needs of prisoners were permissible and would not be punished.

140. It was foreseeable that Defendant Doe 7's failure to properly train, supervise, or discipline Defendant Doe 3 and other healthcare providers at Sussex I would lead to prisoners failing to receive adequate, or any, medical care.

141. Pursuant to Operating Procedure 701.1, Defendant Doe 8, in his/her capacity as Regional Healthcare Administrator, supervises VDOC healthcare nursing staff, including Doe 4, in the region including Wallens Ridge. As provided in that Operating Procedure, when there is a violation of policy regarding clinical care or healthcare management within the region, Defendant Doe 8 is responsible for approving proposed disciplinary measures for healthcare staff.

142. Upon information and belief, Defendant Doe 8 failed to properly (a) supervise Doe 4's provision—or lack thereof—of medical care to Mr. Garrett; (b) ensure that Doe 4 was adequately providing Mr. Garrett medical care as ordered by the discharging physician at Southside Regional Medical Center; (c) train Doe 4 on the adequate level of medical attention necessary for the severity Mr. Garrett's injuries; (d) train Doe 4 on his/her obligations under the United States Constitution concerning deliberate indifference to the serious medical needs of prisoners; (e) investigate Doe 4's failure to provide medical care to Mr. Garrett; and (f) discipline Doe 4 for his/her failure to provide medical care to Mr. Garrett.

143. As a result of his/her investigative and administrative inaction, Defendant Doe 8 tacitly encouraged, and continue to encourage, Defendant Doe 4 and other healthcare providers at Wallens Ridge to believe that their denial of healthcare, including failure to follow outside care provider instructions and deliberate indifference to the serious medical needs of prisoners were permissible and would not be punished.

144. It was foreseeable that Defendant Doe 8's failure to properly train, supervise, or discipline Defendant Doe 4 and other healthcare providers at Wallens Ridge would lead to prisoners failing to receive adequate, or any, medical care.

145. Pursuant to Operating Procedure 701.1, Defendant Doe 9, in his/her capacity as Chief Nurse, supervises VDOC healthcare nursing staff, including Doe 3 and Doe 4, and has primary responsibility for staffing and personnel with the nursing specialty.

146. Defendant Clarke, as Director of VDOC, serves as the official governing authority for VDOC and holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that VDOC healthcare staff provide adequate healthcare to prisoners within VDOC facilities.

147. Defendant Robinson, as the Chief of Corrections Operations for VDOC, leads VDOC facilities and holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that VDOC healthcare staff provide adequate healthcare to prisoners within VDOC facilities.

148. Defendant Steve Herrick, in his capacity as Health Services Director of VDOC, exercises direct day-to-day supervisory authority over the provision of medical care services to prisoners incarcerated in VDOC facilities, including Sussex I and Wallens Ridge.

149. Upon information and belief, Defendants Doe 9, Clarke, Robinson, and Herrick failed to properly (a) supervise Doe 3's and Doe 4's provision—or lack thereof—of medical care to Mr. Garrett; (b) ensure that Doe 3 and Doe 4 were adequately providing Mr. Garrett medical care as ordered by the discharging physician at Southside Regional Medical Center; (c) train Doe 3 and Doe 4 on the adequate level of medical attention necessary for the severity Mr. Garrett's injuries; (d) train Doe 3 and Doe 4 on their obligations under the United States Constitution concerning

deliberate indifference to the serious medical needs of prisoners; (e) investigate Doe 3's and Doe 4's failure to provide medical care to Mr. Garrett; and (f) discipline Doe 3 and Doe 4 for their failure to provide medical care to Mr. Garrett.

150. As a result of their investigative and administrative inaction, Defendants Doe 9, Clarke, Robinson, and Herrick tacitly encouraged, and continue to encourage, Doe 3 and Doe 4 and other healthcare providers to believe that their denial of healthcare, including failure to follow outside care provider instructions and deliberate indifference to the serious medical needs of prisoners were permissible and would not be punished.

151. It was foreseeable that Defendants Doe 9, Clarke, Robinson, and Herrick's failure to properly train, supervise, or discipline Doe 3 and Doe 4 and other healthcare providers would lead to prisoners failing to receive adequate, or any, medical care.

***Defendants Doe 10, Marano, Clarke, Robinson, Manis's Failure to Properly Supervise, Train, and Discipline Defendant Sergeant Rutherford's Failure to Recognize and Accommodate Mr. Garrett's Disability***

152. VDOC Operating Procedure 801.3 provides guidelines for management regarding and provision of reasonable accommodations for prisoners with disabilities housed within VDOC facilities. That policy makes clear that prisoners are "essentially dependent on the physical conditions of and services provided by the facility." VDOC staff must therefore "ensure that an individual with a disability will not be excluded from participation in, or denied the benefits of, the services, programs, or activities or the facility, or be subjected to discrimination." All staff must complete annual ADA training and be apprised of their duties to accommodate prisoners with disabilities under applicable law and VDOC policy.

153. Under VDOC Operating Procedure 801.3, Defendant Doe 10, as ADA Coordinator for Wallens Ridge, holds responsibility for, among other things, ensuring that prisoners with

disabilities housed at Wallens Ridge receive appropriate accommodations. Defendant Doe 10 reviews all offender requests for reasonable accommodations and maintains a current listing of all facility accommodations provided to prisoners within the facility.

154. VDOC policies also provide that as VDOC ADA Coordinator, Defendant Marano serves as the authority on all issues related to prisoners with disabilities, reasonable accommodations, and application of VDOC Operation Procedure 801.3.

155. Defendant Clarke, as Director of VDOC, holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that prisoners with disabilities are afforded reasonable accommodations.

156. Defendant Robinson, as the Chief of Corrections Operations for VDOC, holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that prisoners with disabilities are afforded reasonable accommodations.

157. Pursuant to VDOC's internal rules, including Operating Procedures 010.1, 135.1, and 135.2, Defendant Manis held responsibility for supervising Wallens Ridge, training the Wallens Ridge's corrections officers and staff, disciplining officers who violate VDOC rules.

158. Upon information and belief, Defendant Doe 10, Defendant Marano, Defendant Clarke, Defendant Robinson, and Defendant Manis, among other things, failed to properly (a) supervise Sergeant Rutherford's and other Wallens Ridge officers' provision—or lack thereof— of reasonable accommodations to Mr. Garrett; (b) ensure that Sergeant Rutherford and Wallens Ridge officers were adequately providing Mr. Garrett reasonable accommodations; (c) train Sergeant Rutherford and Wallens Ridge officers on their obligations under the ADA concerning the recognition of disabilities and provision of reasonable accommodations to prisoners with disabilities; (e) investigate Sergeant Rutherford's and other Wallens Ridge officers' failure to

provide reasonable accommodations to Mr. Garrett; and (f) discipline Sergeant Rutherford and other Wallens Ridge officers for their failure to provide reasonable accommodations to Mr. Garrett.

159.  As a result of their investigative and administrative inaction, Defendant Doe 10, Defendant Marano, Defendant Clarke, Defendant Robinson, and Defendant Manis tacitly encouraged, and continue to encourage, Sergeant Rutherford and other Wallens Ridge staff to believe that their failure to provide reasonable accommodations and/or failure to recognize prisoners with disabilities was permissible and would not be punished.

160.  It was foreseeable that Defendant Doe 10, Defendant Marano, Defendant Clarke, Defendant Robinson, and Defendant Manis's failure to properly train, supervise, or discipline Sergeant Rutherford and other Wallens Ridge staff would lead to prisoners failing to receive reasonable, or any, accommodations for their disabilities.

161.  Because of Defendants' collective actions and omissions, Mr. Garrett has suffered and continues to suffer physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and other non-economic losses in an amount to be proven at trial.

162.  Defendants' actions were egregious, warranting punitive damages.

### CLAIMS FOR RELIEF

#### COUNT I
#### 42 U.S.C. § 1983 (Violation of the Eighth Amendment; Excessive Force)
#### Against Defendants Franklin and Shy

163.  Mr. Garrett incorporates and realleges the foregoing paragraphs as if fully set forth herein.

164.  Defendants Franklin and Shy violated Mr. Garrett's Eighth Amendment right to be free from "the unnecessary and wanton infliction of pain" through their excessive use of force

against Mr. Garrett. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

165. Defendants Franklin and Shy used more than *de minimus* force against Mr. Garrett when they ordered their canines to attack him. The canines mauled Mr. Garrett's leg and arm while the Canine Officers punched him repeatedly, causing him to endure lasting pain and suffering.

166. Further, Defendants Franklin and Shy used more than *de minimus* force against Mr. Garrett when they punched and kicked Mr. Garrett and slammed him against the wall of his cell, all while their canines continued to bite their teeth into Mr. Garrett's limbs.

167. The Canine Officers' actions were not a good-faith effort to maintain order or restore discipline during a cell extraction, but rather were carried out maliciously, sadistically, and for the sole purpose of causing harm to Mr. Garrett.

a)    The Canine Officers had no need to order the canine attack. At the time the attack was ordered, Mr. Garrett was standing alone in his cell with the door closed waiting with his hands behind his back to be handcuffed.

b)    The Canine Officers' attack was a disproportionately forceful response, even had there been a purported need to use force. The officers failed to restrain their dogs even after Mr. Garrett had collapsed to the ground during their attack. The Canine Officers then exacerbated the disproportionate response by kicking and punching Mr. Garrett and violently slamming him into the side of his cell.

c)    The Canine Officers made no attempts to temper the severity of their overly forceful response to Mr. Garrett. Instead, they allowed their canines to maul Mr. Garrett's body while they punched him repeatedly and slammed his body against the wall.

168.  Because of Defendant Franklin's and Defendant Shy's excessive use of force, Mr. Garrett has suffered and continues to suffer extreme physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, and other non-economic losses in an amount to be proven at trial.

169.  Defendants' actions were egregious, warranting punitive damages.

### COUNT II
**Intentional Torts: Assault, Battery, Intentional Infliction of Emotional Distress
Against Defendants Franklin and Shy**

170.  Mr. Garrett incorporates and realleges the foregoing paragraphs as if fully set forth herein.

171.  Defendants Franklin and Shy committed assault and battery upon Mr. Garrett when they intentionally punched him in the head repeatedly, slammed him into the side of his cell, and released their patrol canines to attack him.

172.  Their conduct was intentional and done with the purpose of inflicting pain upon Mr. Garrett. Their actions were done without consent, excuse, or justification.

173.  The Canine Officers encouraged their canine to continue attacking Mr. Garrett, causing Mr. Garrett to apprehend imminent forceful battery.

174.  The Canine Officers' outrageous and intolerable conduct intentionally or recklessly caused severe emotional distress to Mr. Garrett. Their ruthless attack caused intense psychological damage, to the point where Mr. Garrett can no longer function in society and is housed in a mental institution.

### COUNT III
**42 U.S.C. § 1983 (Violation of the Eighth Amendment; Supervisory Liability for Failure to
Train, Supervise, or Discipline: Use of Canines)
Against Defendants Doe 2, Hamilton, Clarke, Robinson, and Barbetto**

175. Defendants Doe 2, Hamilton, Clarke, Robinson, and Barbetto have an obligation to ensure that their subordinates act within the law and, when they have notice of a subordinate's tendency to act unlawfully, to prevent such misconduct. *See Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002).

176. As Sussex I's Canine Sergeant, Defendant Doe 2 is responsible for using his specialized training and experience in patrol canine field operations to provide support, training, and management for canine officers such as Defendant Franklin and Defendant Shy. Defendant Doe 2 is further responsible for ensuring canine officers in Sussex I, including Defendant Franklin and Defendant Shy, comply with VDOC policies concerning the use of force and the use of canines and ensuring that they do not use their canines as weapons of excessive force against prisoners in his facility, including through disciplinary action.

177. As Warden of Sussex I, Hamilton is responsible for properly training Sussex I's corrections officers, including Defendant Franklin and Defendant Shy, on the permissive use of force, including but not limited to the use of canines as a means of force. Defendant Hamilton is also responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and the use of canines and ensuring that officers do not use their canines as weapons of excessive force against prisoners in his facility, including through disciplinary action.

178. As Director of VDOC, Defendant Clarke serves as the official governing authority for VDOC and is responsible for ensuring that Sussex I's corrections officers, including Defendant Franklin and Defendant Shy, are properly trained on the permissive use of force, including but not limited to the use of canines as a means of force. Defendant Clarke is also responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and the use

of canines and ensuring that officers do not use their canines as weapons of excessive force against prisoners in his facility, including through disciplinary action.

179. As the Chief of Corrections Operations for VDOC, Defendant Robinson leads VDOC facilities and is responsible for ensuring that Sussex I's corrections officers, including Defendant Franklin and Defendant Shy, are properly trained on the permissive use of force, including but not limited to the use of canines as a means of force. Defendant Robinson is also responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and the use of canines and ensuring that officers do not use their canines as weapons of excessive force against prisoners in his facility, including through disciplinary action.

180. As Statewide Canine Program Coordinator, Defendant Barbetto coordinates training and field operations for VDOC Canine Program, including Defendant Franklin, and Defendant Shy, and other canine officers in Sussex I. He is responsible for supervising and ensuring compliance with VDOC policies concerning the use of force and use of canines and ensuring that they do not use their canines as weapons of excessive force against prisoners in his facility, including through disciplinary action.

181. Upon information and belief, canine officers at Sussex I have engaged in the pervasive conduct of using patrol dogs to attack prisoners when there is no legitimate penological justification for doing so, in violation of the prisoners' Eighth Amendment right to be free from cruel and unusual punishment. The pervasive deployment of canines at Sussex I to attack prisoners without a legitimate penological justification existed well before December 25, 2018, when Mr. Garrett was attacked, and continues to this day.

182. Defendants Doe 2, Hamilton, Clarke, Robinson, and Barbetto have actual or constructive knowledge of the widespread abusive conduct by their subordinates in using canines

to attack prisoners and had such knowledge on or before December 25, 2018. Defendant Doe 2's, Defendant Hamilton's, Defendant Clarke's, Defendant Robinson's, and Defendant Barbetto's response to that knowledge, which on information and belief was to do nothing, was so inadequate as to show deliberate indifference to or tacit approval of such unconstitutional practice.

183. Defendant Doe 2's, Defendant Hamilton's, Defendant Clarke's, Defendant Robinson's, and Defendant Barbetto's inactions caused Defendant Franklin's and Defendant Shy's unconstitutional deployment of their patrol dogs against Mr. Garrett on December 25, 2018.

<div align="center">

**COUNT IV**
**42 U.S.C. § 1983 (Violation of the Eighth Amendment; Supervisory Liability for Failure to Train, Supervise, or Discipline: Denial of Adequate Medical Care)**
**Against Defendants Clarke, Robinson, Herrick, Hamilton, Manis, and Does 5-9**

</div>

184. Defendants Clarke, Robinson, Herrick, Hamilton, Manis, and Does 5 through 9 have an obligation to ensure that their subordinates act within the law and, when they have notice of a subordinate's tendency to act unlawfully, to prevent such misconduct. *See Randall*, 302 F.3d at 203.

185. As Director of VDOC, Defendant Clarke serves as the official governing authority for VDOC and holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that VDOC healthcare staff provide adequate healthcare to prisoners within VDOC facilities.

186. As the Chief of Corrections Operations for VDOC, Defendant Robinson leads VDOC facilities and holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that VDOC healthcare staff provide adequate healthcare to prisoners within VDOC facilities.

187.  Defendant Steve Herrick, in his capacity as Health Services Director of VDOC, exercises direct day-to-day supervisory authority over the provision of medical care services to prisoners incarcerated in VDOC facilities, including Sussex I and Wallens Ridge.

188.  As Warden of Sussex I, Hamilton is responsible for properly supervising Sussex I, training Sussex I's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility. Further, under Operating Procedure 720.1, Defendant Hamilton bears responsibility for ensuring that all prisoners "have timely access to, and are provided adequate health care services."

189.  As Warden of Wallens Ridge, Defendant Manis was responsible for properly supervising Wallens Ridge, training the Wallens Ridge's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility. Further, under Operating Procedure 720.1, Defendant Manis bore responsibility for ensuring that all prisoners "have timely access to, and are provided adequate health care services."

190.  As Head Nurse at Sussex I, Defendant Doe 5 oversees the on-duty healthcare personnel, including Doe 3, providing medical care to individuals housed in medical segregation and/or solitary confinement at Sussex I. Further, upon information and belief, in his/her capacity as Head Nurse, Defendant Doe 5 is responsible administratively and clinically for all nurses within the facility and has responsibility for training and disciplining Medical Department staff.

191.  As Head Nurse at Wallens Ridge, Defendant Doe 6 oversees the on-duty healthcare personnel, including Doe 4, providing medical care to individuals housed in medical segregation and/or solitary confinement at Wallens Ridge. Further, upon information and belief, in his/her capacity as Head Nurse, Defendant Doe 6 is responsible administratively and clinically for all

nurses within the facility and has responsibility for training and disciplining Medical Department staff.

192. As a Regional Healthcare Administrator, Defendant Doe 7 supervises VDOC healthcare nursing staff, including Doe 3, in the region including Sussex I. Under VDOC policy, Defendant Doe 7 is responsible for approving proposed disciplinary measures for healthcare staff when there is a policy violation regarding clinical care or healthcare management within the region.

193. As a Regional Healthcare Administrator, Defendant Doe 8 supervises VDOC healthcare nursing staff, including Doe 4, in the region including Wallens Ridge. Under VDOC policy, Defendant Doe 8 is responsible for approving proposed disciplinary measures for healthcare staff when there is a policy violation regarding clinical care or healthcare management within the region.

194. As Chief Nurse for VDOC, Defendant Doe 9 provides clinical supervision to VDOC healthcare nursing staff and has primary responsibility for staffing and personnel with the nursing specialty.

195. Upon information and belief, staff in the Medical Departments at Sussex I and Wallens Ridge have engaged in the pervasive conduct of denying medical care to prisoners or providing inadequate health to prisoners in violation of the prisoners' Eighth Amendment right to be free from cruel and unusual punishment. The pervasive pattern of inadequate healthcare at VDOC facilities, including Sussex I and Wallens Ridge, existed well before December 25, 2018, when Mr. Garrett was initially denied medical care, and continues to this day.

196. Defendants Clarke, Robinson, Herrick, Hamilton, Manis, and Does 5 through 9 have actual or constructive knowledge of the widespread abusive conduct by their subordinates and the

pervasive conduct of denying medical care to prisoners or providing inadequate health to them. Defendants Clarke's, Robinson's, Herrick's, Hamilton's, Manis's, Does 5's through 9's response to that knowledge, which on information and belief was to do nothing, was so inadequate as to show deliberate indifference to or tacit approval of such unconstitutional practice.

197.  Defendants Clarke's, Robinson's, Herrick's, Hamilton's, Manis's, Does 5's through 9's inactions caused Defendant Doe 3's and Defendant Doe 4's unconstitutional failure to provide Mr. Garrett medical care.

<div align="center">COUNT V</div>

**42 U.S.C. § 1983 (Violation of the Eighth Amendment; Supervisory Liability for Failure to Train, Supervise, or Discipline: Denial of Reasonable Disability Accommodations) Against Defendants Clarke, Robinson, Marano, Manis, and Doe 10**

198.  Defendants Clarke, Robinson, Marano, Manis, and Doe 10 have an obligation to ensure that their subordinates act within the law and, when they have notice of a subordinate's tendency to act unlawfully, to prevent such misconduct. *See Randall*, 302 F.3d at 203.

199.  VDOC Operating Procedure 801.3 makes clear that VDOC staff must "ensure that an individual with a disability will not be excluded from participation in, or denied the benefits of, the services, programs, or activities or the facility, or be subjected to discrimination."

200.  As Director of VDOC, Defendant Clarke, holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that prisoners with disabilities are afforded reasonable accommodations.

201.  As the Chief of Corrections Operations for VDOC, Defendant Robinson holds responsibility for the health and welfare of prisoners within VDOC facilities, including ensuring that prisoners with disabilities are afforded reasonable accommodations.

202.  As VDOC ADA Coordinator, Defendant Marano serves at the authority on all issues related to prisoners with disabilities, reasonable accommodations, and the application of VDOC Operation Procedure 801.3.

203.  As Warden of the Wallens Ridge, Defendant Manis was responsible for properly supervising Wallens Ridge, training the Wallens Ridge's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility.

204.  As ADA Coordinator for Wallens Ridge, Defendant Doe 10 holds responsibility for, among other things, ensuring that prisoners with disabilities housed at Wallens Ridge receive appropriate accommodations. Defendant Doe 9 reviews all offender requests for reasonable accommodations and maintains a current list of all facility accommodations provided to prisoners within the facility.

205.  Upon information and belief, officers at Wallens Ridge have engaged in the pervasive conduct of denying prisoners with disabilities reasonable accommodations and failing to recognize prisoners with disabilities, in violation of the ADA, among other laws. The pervasive pattern of denial of reasonable accommodations existed well before January 31, 2019, when Mr. Garrett was transferred to Wallens Ridge, and continues to this day.

206.  Defendants Clarke, Robinson, Marano, Manis, and Doe 10 have actual or constructive knowledge of the widespread abusive conduct by their subordinates in denying reasonable accommodations to prisoners with disabilities and had such knowledge on or before January 31, 2019. Defendants' response to that knowledge, which on information and belief was to do nothing, was so inadequate as to show deliberate indifference to or tacit approval of such illegal practice.

48

207.     Defendant Clarke's, Defendant Robinson's, Defendant Marano's, Defendant Manis's, and Defendant Doe 10's inactions caused the denial of any reasonable accommodations to Mr. Garrett despite his disability caused by an attack in a VDOC facility.

<div align="center">

**COUNT VI**
**42 U.S.C. § 1983 (Violation of the Eighth Amendment; Supervisory Liability for Failure to Reform VDOC Canine and Use of Force Policies)**
**Against Defendants Clarke, Robinson, and Barbetto**

</div>

208.  Mr. Garrett incorporates and realleges the foregoing paragraphs as if fully set forth herein.

209.  The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of prisoners within their facility. *Cox v. Quinn*, 828 F.3d 227, 237 (4th Cir. 2016).

210.  Moreover, the Eighth Amendment affords prisoners the right to be free from "the unnecessary and wanton infliction of pain." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

211.  Upon information and belief, canine officers at Sussex I and in other facilities managed by VDOC have engaged in the pervasive conduct of deploying dogs to attack prisoners when there is no legitimate penological justification for doing so, in violation of the prisoners' Eighth Amendment right to be free from cruel and unusual punishment. The pervasive pattern of canine officers using patrol dogs on prisoners without a legitimate penological justification existed well before December 25, 2018, when Mr. Garrett was attacked, and continues to this day.

212. Despite widespread recognition that the use of unmuzzled canines to bite or physically restrain prisoners is extreme, brutal, and "inherently degrading," this widespread and pervasive pattern of canine attacks against prisoners is authorized, permitted, and condoned by the official VDOC Operating Procedures, including but not limited to Operating Procedure 435.3,

49

which permits officers to engage canines to bite or physically control prisoners during cell extractions in Virginia correctional institutions.

213. Further, this pervasive pattern of canine attacks against prisoners is authorized, permitted, and condoned by official VDOC Operating Procedures, including but not limited to Operating Procedure 435.3, and the official policies, practices, customs and/or usages that fail to adequately: (a) ensure that the canines are deployed in a manner consistent with VDOC Operating Procedure or other widely accepted guidance for the use of patrol canines; (b) investigate excessive deployment of canines; (c) discipline officers for their actions or failure to intervene in connection with incidents of brutality arising from the deployment of canines; (c) ensure corrections officers are properly trained on the use of canines in VDOC facilities; and (e) ensure that the canines and/or canine officers are sufficiently trained in accordance with VDOC Operating Procedure, Canine Training Academy criteria, or other widely accepted canine officer and canine training standards.

214. Defendant Clarke, in his capacity as Director of VDOC, approves and authorizes these policies.

215. Defendant Robinson, in his capacity as Chief of Corrections Operations of VDOC, approves and authorizes these policies.

216. Defendant Barbetto, in his capacity as a Statewide Canine Program Coordinator, holds responsibility for reviewing and approving these policies.

217. VDOC, Defendant Clarke, Defendant Robison, and Defendant Barbetto have actual or constructive knowledge of the widespread abusive conduct of using canines to attack prisoners and had such knowledge on or before December 25, 2018. VDOC's, Defendant Clarke's, Defendant Robinson's, and Defendant Barbetto's response to that knowledge—which, on information and belief was to do nothing and permit these policies to remain in place unchecked—

was so inadequate as to show deliberate indifference to or tacit approval of such unconstitutional practice.

218.   As a legal and proximate cause of VDOC's, Defendant Clarke's, and Defendant Robinson's inactions and continued authorization of the use of canines in official VDOC policies, Defendants have violated Mr. Garrett's rights to be free from excessive force secured by the Eighth and Fourteenth Amendments.

COUNT VII

**Gross Negligence (Violation of Duty to Administer VDOC Operating Procedures and Canine Program)**
**Against Defendant Hamilton, Defendant Doe 2, and Defendant Barbetto**

219.   Mr. Garrett incorporates and realleges the foregoing paragraphs as if fully set forth herein.

220.   As Warden of Sussex I, Defendant Hamilton is responsible for properly training the Prison's corrections officers, including Defendants Franklin and Shy, on the permissive use of force.

221.   As the Prison's Canine Sergeant, Defendant Doe 2 is responsible for using his specialized training and experience in patrol canine field operations to provide support for canine officers such as Defendant Franklin and Defendant Shy. He is tasked with training canine officers so that they do not use their canines as weapons of excessive force against prisoners in his facility.

222.   As Statewide Canine Program Coordinator, Defendant Barbetto is responsible for, among other things, coordinating training and field operations for VDOC's Canine Program, ensuring that VDOC canine officers are in compliance with their obligations under VDOC policy and the United States Constitution, and training canine officers so that they do not use their canines as weapons of excessive force against prisoners.

223. Defendant Hamilton, Defendant Doe 2, and Defendant Barbetto are tasked with directing corrections officers, including Defendant Franklin and Defendant Shy, in how to engage in uses of force on prisoners.

224. Because it is reasonably foreseeable that using force on prisoners would create a danger of harm to others, Defendant Hamilton, Defendant Doe 2, and Defendant Barbetto have a duty to use ordinary care and skill to avoid such harm through their administration of VDOC's Operating Procedures and Canine Program.

225. Despite their awareness of the numerous incidents of unjustifiable canine attacks against inmates by VDOC Canine Officers, Defendant Hamilton, Defendant Doe 2, and Defendant Barbetto intentionally or recklessly failed to amend VDOC's Operating Procedures and Canine Program or otherwise augment the training and discipline of VDOC canine officers to prevent the reoccurrence of such incidents.

226. Fair minded people would be shocked to find that VDOC prison officials like Defendant Hamilton, Defendant Doe 2, and Defendant Barbetto—who had a full view of the repeated canine attacks against inmates by VDOC canine officers leading to serious injuries of multiple incarcerated persons—would choose to do nothing to prevent the reoccurrence of such attacks.

227. Defendant Hamilton's, Defendant Doe 2's, and Defendant Barbetto's complete and total inaction in the face of widespread unjustifiable canine attacks against inmates by VDOC canine officers constitutes an utter disregard of prudence and complete indifference toward and neglect of the safety of VDOC inmates like Mr. Garrett, and resulted in serious and foreseeable harm to Mr. Garrett.

**COUNT VIII**
**42 U.S.C. § 1983 (Violation of the Eighth Amendment; Direct Liability for Denial of Medical Care)**
**Against Defendants Clarke, Robinson, Herrick, Hamilton, Manis, and Does 3 through 6**

228.  Mr. Garrett incorporates and realleges the foregoing paragraphs as if fully set forth herein.

229.  "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017) (citations omitted). A plaintiff may assert "a medical treatment claim . . . against non-medical personnel" if "they were *personally involved* with a denial of treatment . . . or *tacitly authorized or were indifferent to* the prison physicians' misconduct." *Lewis v. Angelone*, 926 F. Supp. 679, 73 (W.D. Va. 1996) (emphasis added).

230.  After returning from the hospital, Mr. Garrett had serious medical needs diagnosed by a physician that mandated ongoing treatment and follow-up.

231.  Defendants were deliberately indifferent to Mr. Garrett's ongoing medical needs and engaged in behaviors done for the very purpose of causing harm or with knowledge that harm will result.

a)  Defendant Hamilton and Defendant Clarke approved Mr. Garrett's transfer to Wallens Ridge, knowing and disregarding the risk of harm that would result from confining him to a nonmedical facility despite his recent return from the hospital and need for prolonged medical care.

b)  In transporting him to a nonmedical facility, Defendants Hamilton and Clarke prolonged Mr. Garrett's suffering and denied him proper medical treatment for his injuries.

c)    Further, Defendant Hamilton, despite having responsibility for ensuring that prisoners within Sussex I "have timely access to, and are provided adequate health care services," did nothing in response to his knowledge that the healthcare staff at Sussex I, including Doe 3, were not providing Mr. Garrett with adequate medical care. Through his inaction, Defendant Hamilton tacitly authorized and demonstrated indifference toward the Sussex I healthcare staff's misconduct.

d)    Doe 3 was aware of, and disregarded, the excessive risks of harm to Mr. Garrett's health and safety when she/he ignored Mr. Garrett's emergency room discharge instructions to change his bandages daily and disinfect his wounds for over a week while in solitary confinement at Sussex I.

e)    Doe 3 failed to provide Mr. Garrett with medical treatment, which resulted in Mr. Garrett developing a progressive severe infection in his leg and arm.

f)    Even after diagnosing Mr. Garrett with the infection and prescribing antibiotics, Doe 3 continued to disregard the substantial risk of harm that would befall Mr. Garrett should she continue depriving him of care for his serious medical needs.

g)    As a result, Mr. Garrett developed another infection and endured unnecessary pain and suffering.

h)    Doe 4 was aware of, and disregarded, the excessive risks of harm to Mr. Garrett's health and safety in refusing to change his bandages or disinfect his wounds while he remained in medical segregation at Wallens Ridge.

i)    Doe 4 provided constitutionally inadequate care that caused Mr. Garrett significant physical harm and deliberately inflicted unnecessary and wanton pain upon him.

j)  Defendants Doe 5 and 6, in their capacities as Head Nurses of Sussex I and Wallens Ridge, respectively, failed to provide Mr. Garrett adequate medical care.

k)  Defendant Manis, despite having responsibility for ensuring that prisoners within Wallens Ridge "have timely access to, and are provided adequate health care services," did nothing in response to his knowledge that the healthcare staff at Wallens Ridge, including Defendant Does 4-6, were not providing Mr. Garrett with adequate medical care. Through his inaction, Defendant Manis tacitly authorized and demonstrated indifference toward the Wallens Ridge healthcare staff's misconduct.

l)  Defendant Herrick, despite having responsibility for the provision of medical care to prisoners within VDOC facilities, including Sussex I and Wallens Ridge, did nothing in response to his knowledge that the healthcare staff at Sussex I and Wallens Ridge, including Defendant Does 3-6, were not providing Mr. Garrett with adequate medical care. Through his inaction, Defendant Herrick tacitly authorized and demonstrated indifference toward the misconduct by the healthcare staffs of Sussex I and Wallens Ridge.

m)  Defendant Robinson, despite having responsibility for the health and welfare of prisoners within VDOC facilities, including Sussex I and Wallens Ridge, did nothing in response to his knowledge that the healthcare staff at Sussex I and Wallens Ridge, including Defendant Does 3-6, were not providing Mr. Garrett with adequate medical care. Through his inaction, Defendant Robinson tacitly authorized and demonstrated indifference toward the misconduct by the healthcare staffs of Sussex I and Wallens Ridge.

232.  These actions were cruel, unusual, and served no legitimate penological purpose.

233.  As a result of Defendants' actions, Mr. Garrett was seriously deprived of basic human needs and faced significant mental and physical harms.

**COUNT IX**
**Violation of the Americans with Disabilities Act**
**(as amended by the ADA Amendments Act of 2008)**
**Against Defendant VDOC**

234. Mr. Garrett incorporates and realleges the foregoing paragraphs as if fully set forth herein.

235. VDOC (by and through the individual Defendants acting in their official capacities) is a public entity as defined in 42 U.S.C. § 12131(1)(A).

236. Because of the attack, Mr. Garrett developed acute nerve damage. Able to walk or move his left arm only slowly and with great discomfort, he was "substantially limited" in "one or more of his major life activities," qualifying him as an individual with a disability as defined in the Americans with Disabilities Act. 42 U.S.C. §§ 12102(1)(A). Specifically, his impairment constituted a qualifying disability because it "substantially limit[ed] the ability of [Mr. Garrett] to perform a major life as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1) (2020).

237. Mr. Garrett's claim under the ADA is timely because he filed the instant action within four years of the denial of his requests for accommodations, the statute of limitations for claims "made possible" by the ADA Amendments Act of 2008, Pub. L. No. 110-325. *See Dickinson v. Univ. of North Carolina*, 91 F. Supp. 3d 755, 766 (M.D.N.C. 2015). Mr. Garrett's claims are "made possible" by the ADA Amendments Act because before enactment of the ADA Amendments, moderate difficulty or pain experienced while walking or standing, such as Mr. Garrett's right foot neuropathy, did not constitute a "qualifying disability" for purposes of the ADA.

238. Prison officials at Wallens Ridge, including Sergeant Rutherford, were apprised of Mr. Garrett's disability upon intake and thereafter.

239. Despite having a disability, Mr. Garrett was denied equal access to the programs, services, and activities provided by VDOC employees at Wallens Ridge, including those programs and activities available to prisoners housed in VDOC's general population such as meals and medication dispersals. *See* 42 U.S.C. §§ 12102(2), 12131(2).

240. VDOC violated the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). In particular, VDOC employees cited Wallens Ridge policies when they denied Mr. Garrett the use of an ambulatory assistive device at intake. This denial deprived Mr. Garrett of the opportunity to eat, take his medications, and walk freely without pain throughout the facility.

241. Further, Wallens Ridge Sergeant Rutherford failed to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Id*. Specifically, Sergeant Rutherford refused to allow Mr. Garrett's meals to be brought to his cell, requiring Mr. Garrett, who was without an assistive device, to walk from his cell to receive food.

242. As Warden of the Wallens Ridge, Defendant Manis was responsible for properly supervising Wallens Ridge, training Wallens Ridge's corrections officers and staff, disciplining officers who violate VDOC rules, and ensuring the minimum health, safety, and welfare of prisoners within the facility.

243. As ADA Coordinator for Wallens Ridge, Defendant Doe 10 holds responsibility for, among other things, ensuring that prisoners with disabilities housed at Wallens Ridge receive appropriate accommodations. Defendant Doe 9 reviews all offender requests for reasonable

accommodations and maintains a current list of all facility accommodations provided to prisoners within the facility.

244. VDOC's discrimination is intentional and/or represents deliberate indifference to the strong likelihood that the actions and omissions enumerated were likely to result in a violation of federally protected rights.

245. As a proximate and foreseeable result of the Defendants' discriminatory acts and omissions, Mr. Garrett suffered injuries including pain, suffering, and emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectfully requests judgment in favor of Mr. Garrett and against all Defendants, and grant of the following:**

A. Enter a declaratory judgment on behalf of Mr. Garrett that Defendants' actions and omissions described herein constituted violations of the Eighth Amendment, ADA, and Virginia common law;

B. Enter a judgment on behalf of Mr. Garrett against Defendants for actual damages sufficient to compensate him for the violation of his constitutional rights and rights under the ADA and Virginia law;

C. Order Defendants to pay punitive and other exemplary damages based on 42 U.S.C. § 1983 claims;

D. Order Defendants to pay Mr. Garrett's attorney fees and costs as authorized by 42 U.S.C. § 1988; and

E. Grant such other equitable relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

August 18, 2021                                  Respectfully submitted,

                                                 */s/ Andrew E. Talbot*
                                                 Ian S. Hoffman (VA Bar # 75002)
                                                 Andrew E. Talbot (VA Bar # 93801)
                                                 John A. Freedman (admitted *pro hac vice*)
                                                 ARNOLD & PORTER KAYE SCHOLER LLP
                                                 601 Massachusetts Ave., N.W.
                                                 Washington, D.C.   20001-3743
                                                 Tel: 202.942.5000
                                                 Fax: 202.942.5999
                                                 E-mail: Ian.Hoffman@arnoldporter.com
                                                 E-mail: Andrew.Talbot@arnoldporter.com
                                                 E-mail: John.Freedman@arnoldporter.com

                                                 Lauren S. Wulfe (admitted *pro hac vice*)
                                                 ARNOLD & PORTER KAYE SCHOLER LLP
                                                 777 S. Flower St., 44th Floor
                                                 Los Angeles, CA 90017-5844
                                                 Tel: 213.243.4000
                                                 Fax: 213.243.4199
                                                 E-mail: Lauren.Wulfe@arnoldporter.com

                                                 Oren Nimni (admitted *pro hac vice* )
                                                 Kelly Jo Popkin (admitted *pro hac vice*)
                                                 RIGHTS BEHIND BARS
                                                 416 Florida Ave. NW #26152
                                                 Washington, D.C. 20001
                                                 Tel: 202.455.4399
                                                 E-mail: oren@rightsbehindbars.org
                                                 E-mail: kellyjo@rightsbehindbars.org

                                                 *Attorneys for Plaintiff*