IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CURTIS J. GARRETT,

                                        Plaintiff,

          versus                                  3:20cv986

COMMONWEALTH OF VIRGINIA,

                                        Defendant


Before:   HONORABLE JOHN A. GIBNEY, JR.
          United States District Judge


Aril 18, 2022

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

APPEARANCES


ARNOLD & PORTER KAYE SCHOLER LLP
by:  Andrew Edward Talbot, Esq.
        Oren Nimni, Esq.



Laura Elizabeth Maughan, Esq.
Assistant Attorney General
For the Commonwealth of Virginia

THE CLERK:  Case number 3:20 CV 986.

Curtis J. Garrett versus Commonwealth.

Mr. Andrew Edward Talbot and Mr. Oren Nimni represent the plaintiff.

Ms Laura Maughan represents the defendant.

Are counsel ready to proceed?

MR. TALBOT:  Plaintiff is ready, Your Honor.

MS MAUGHAN:  Defendants are ready, Your Honor.

THE COURT:  Well, we are here today on two motions; I guess, the plaintiff's motion to file a third amended complaint and the defendant's motion to dismiss I guess a second amended complaint, which sort of morphs into the third amended complaint because I think a lot of the argument that deals with the amendment and dismissal arise out of the statute of limitations.

So let's hear from Mr. Talbot or Mr. Nimni, whoever is going to go first on this.

MR. TALBOT:  Good morning, Your Honor.

So, I think many of the arguments have been more than adequately covered by the briefs, so if The Court has questions on any specific areas you would like me to address I am happy to start there.  Otherwise, I will highlight a couple of --

THE COURT:  Here is my question.  This case has

been hanging around here since 2020.  How does it take you so long to figure out who to add as defendants in this case?

MR. TALBOT:  Judge, ultimately we have conducted a good faith investigation into public records, we have tapped into the knowledge that Mr --

THE COURT:  Did you do interrogatories to find out who the people were?  That is the thing.

MR. TALBOT:  Your Honor, we did so at our earliest opportunity, which was after the 26 F conference that the parties held.  Our understanding of the local and case law is that we are just simply --

THE COURT:  Well, you have to wait for that, but that was when, July?

MR. TALBOT:  We held our 26 F conference, yes, at the end of last year.

THE COURT:  So, why did you -- so here we are nine month after that.  Why did we wait until now to have to add these people to the law suit?  Hold on one second.  Something is wrong with my hearing aid.  I have to adjust it.

Okay.  Go ahead.

MR. TALBOT:  So, first with respect to the Warden Manis.  We actually --

THE COURT:  Let me just ask you.  Did you call

them up and say, who was the guy with the dogs?  That is what you should have done at the very beginning of the case.  I am sure that the Commonwealth would have given you their name.  Fairly sure.  I would have when I was in the Attorney General's office.

MR. TALBOT:  Understood.  Judge, with respect to Warden Manis, the previous defendant, Davis, we had no reason to believe that we had named an incorrect defendant.  Defendant Davis accepted service.

THE COURT:  Well, I mean the guy with the dogs down at Sussex, the dog that bit him.  You are trying to ask these -- what's his name -- the other guy is now, right?

MR. TALBOT:  Yes, sir, Your Honor.  As you recall from the previous defendant we had named Defendant Williams and you ordered the defendants at the last hearing to tell us the names of the correct canine patrol officers.  Defendants have withdrawn their statute of limitation arguments for the canine patrol officers.

THE COURT:  Okay.  All right.  Go ahead.

MR. TALBOT:  So, I guess with respect to the other set of defendants, the supervisors, just simply put we have requested this information at the first opportunity we had after the 26 F conference.  And we

had no control over the speed with which the defendants would produce this information.  And as soon as they did we promptly moved for leave to amend less than three weeks after we learned the names of the supervisors.

THE COURT:  So you asked for it in July and they gave it to you when?

MR. TALBOT:  In October.  Actually, it was -- it was very late July, early August, when we asked for them.

THE COURT:  And they didn't give it to you until October?

MR. TALBOT:  That's correct.

THE COURT:  What was the hold up?

MR. TALBOT:  I am not sure.

THE COURT:  Okay.  Go ahead.

So here is the thing.  Going back really is what most of these motions, most motions to dismiss and most of the motions to amend turns on.  Do you agree with that?

MR. TALBOT:  Yes, that is a large portion of what --

THE COURT:  The relation back step is pretty fact specific.  You have to know what people knew, when they knew it, and we have to figure out what kind of

relationship people had.  So, you know, you and I are sharing the same office, and you get sued for something we did together, the odds are pretty good that I would know I would be a defendant, too, if I were involved in it.  But I don't think you have developed that evidence yet, have you?

MR. TALBOT:  No.

THE COURT:  So tell me where do we stand on discovery in this case?

MR. TALBOT:  The parties have begun on discovery with respect to claims that are not subject to the pending motions to dismiss.

THE COURT:  Okay.  Well, all right.

But, I mean there are all kind of tied up together, aren't they?  I mean, you have got on the one hand what happened down at Sussex, and that is, you know, the dog-bite case.  And then you have got what happened when he went out to wherever in western Virginia, Wallens Ridge, and whether he got the right medical care out there.

You know whether you bring in the supervisors or not, it is pretty much the same discovery, isn't it?

MR. TALBOT:  Yes.  We are engaging in discovery with respect to the claims related to the canine attack.  It is the claims that concern the denial of

access to medical care and denial of reasonable disability accommodation that we haven't started on discovery because those are still subject to the pending motion to dismiss.

THE COURT:  Well, really with respect to the ADA claim what you have to make out is a 1983 claim, right, constitutional violation, eighth amendment violation, in order to make a -- in order to kick in the waiver of sovereign immunity, right?

MR. TALBOT:  Respectfully, Your Honor, I think that under section five and the 14th amendment Congress can now be abrogated --

THE COURT:  In order to, in order to meet the congruency test and that stuff, and the waiver of 11th amendment defense, you pretty much have got to establish almost an eighth amendment violation in order to get the ADA claim in the case, don't you?

MR. TALBOT:  Respectfully, I think that the case law would support that as long as the claims at least implicate Constitutional rights.  And then you can have a valid abrogation of sovereign immunity.

THE COURT:  Well, all right.

MR. TALBOT:  So I guess I will start with --

THE COURT:  You are doing pretty good so far.

MR. TALBOT:  Thanks, Judge.  I will highlight a

couple of points for the relation back argument.  So, I think that most of the elements are pretty well --

THE COURT:  Are you doing any depositions yet in this case?

MR. TALBOT:  No, Judge.

THE WITNESS:  Have you scheduled them?

MR. TALBOT:  Not yet, Your Honor.

THE COURT:  Have you talked to them about scheduling them?

MR. TALBOT:  No.

THE COURT:  Okay.  So, we are not in D C now.  Are you aware of that?

MR. TALBOT:  Yes, sir.

THE COURT:  We are here in the Eastern District of Virginia, and we like to get cases moved along.  And when I have got a 2020 case on my docket I start to worry it will be a 2023 case.  So let's -- you all need to step on this and get this thing set up and ready to try.  But don't worry, I will help you with that.

MR. TALBOT:  Thank you.

THE COURT:  We are here to help, we are the government.  What else you got?

MR. TALBOT:  So I will just for the relation back I just want to highlight a couple of points with respect to the standard.  As you mentioned, Judge, we

haven't had a chance to develop evidence to support relation back, but the Fourth Circuit has made clear that plaintiff is not required to plead affirmatively in his complaint a response to an affirmative defense, and actually the burden is on the defendants at this stage of the motion to dismiss stage to show that there is no possibility of relation back because somehow our allegations were closeded relation back.

THE COURT:  Right.

MR. TALBOT:  So --

THE COURT:  So you all have to develop the evidence from your side, you have got to show these guys would have known about it and that they would not have --

MR. TALBOT:  Correct.

THE COURT:  I've got that.

MR. TALBOT:  Okay.  So just for the notice.

THE COURT:  Let's hop on it, get the evidence together so we can get some of this case resolved before I die.

MR. TALBOT:  Understood, Judge.

I will just briefly point out that there are two independent bases for finding that defendant Manis had adequate notice as we talked about in our brief.

THE COURT:  Well, but you don't have the evidence

yet, right?  So what we are doing right now is speculating.  Is that right?  And I agree that, you know, that the burden of proof on affirmative defenses is with the defendant.  And I -- it's a little difficult in the case of a motion to dismiss because there is no burden of proof because you are not proving anything.  But I don't think it's apparent on the face of the complaint that this person did or did not know about the law suit looming in the horizon coming down to hit them in either Wallens Ridge or Sussex.

So you are pretty good on that.  Move on.

MR. TALBOT:  Sounds good.

Then I will just briefly turn to our count five, which is our claim of supervised reliability based on denial of disability accommodations.

THE COURT:  The stall needs straps, right?

MR. TALBOT:  Yes, Judge.  So I will just focus on the defendants' arguments that we did not allege that the subordinate violated the constitution.  This is wrong.  Mr. Garrett alleged in count five that the health care staff at Wallens Ridge violated his eighth rights because of the denial --

THE COURT:  They took away the guy's cane and they wouldn't let him have it, they didn't provide him with medical care.  Doesn't that pretty much, at least at

this stage of the proceedings, create an arguable eighth amendment claim?

MR. TALBOT:  I would agree, Judge.

THE COURT:  Okay.  Thank you.  You are in pretty good shape on that one, too.

Of course we will hear what the other side has to say.  Ms Maughan may have some good points.  And you can get up and respond.

Is there anything else?

MR. TALBOT:  I will just briefly sum up.  So on that same ground then there is a basis for finding at this stage that --

THE COURT:  I am ready to rule in your favor.  You are welcome to change my mind.

MR. TALBOT:  No, sir.

Would you like me to address the declaratory relief argument?

THE COURT:  Mr. Garrett is out on the street now, right?

MR. TALBOT:  Yes, Judge.  That is what we understand.

THE COURT:  So a declaratory judgment doesn't do him much good, other than sort of giving him something he can tell the people in his family at family reunions about.

MR. TALBOT:  So I think that what the Fourth Circuit has held, instructed that essentially a declaratory judgment is appropriate when it will terminate a controversy.  Here, as far as I know, there is still a controversy of whether the VDOC policies were inadequate to prevent wide-spread Constitutional violations an VDOC prisons, and whether the training was inadequate.  And the mere fact that Mr. Garrett's damages claims would also rise or fall on the same controversy is not a bar to our declaratory relief claim, and that is made apparent by the --

THE COURT:  Well, it just makes it sort of useless.  If you want to win money you have got to prove your case, right?

MR. TALBOT:  Correct.

THE COURT:  You have got to prove a violation, which is what you have to prove in declaratory judgment, right?

MR. TALBOT:  Correct.  Yes.

THE COURT:  Okay.  So I wouldn't press my luck on that.

MR. TALBOT:  Okay.

THE COURT:  All right.  Thank you very much.  You may be seated.

And let me just say, good job on the briefing and

good job on the argument.  So I take it -- how long have you been an associate at Arnold and Porter?

MR. TALBOT:  Almost three years.

THE COURT:  Where did you go to law school?

MR. TALBOT:  University of Virginia.

THE COURT:  Wahoowa.

And did you go to under grad there, too?

MR. TALBOT:  Yes, sir.

THE COURT:  And what did you major in?

THE WITNESS:  History.

THE COURT:  Well, now you are making history.  Well, congratulations.  Did you do a clerkship after you were done?

MR. TALBOT:  Yes, sir.  I clerked for Judge Ellis in the Alexandria Division.

THE COURT:  Well, you weren't there when he was handling that poor guy that was prosecuting the guy in the Trump campaign.

MR. TALBOT:  I was actually.

THE COURT:  You were?

MR. TALBOT:  Talk about history.

THE COURT:  Talking about history, you have seen some, haven't you?

MR. TALBOT:  Yes, sir.

THE COURT:  Well, Judge Ellis is a great judge,

and I am glad that you had the opportunity to work with him.

Let's hear from Ms Maughan.

Ms Maughan, here is what I think about this.

I think you may well have a good statute of limitations argument as to some of these people.  But I am not too sure that we can decide it until we have evidence about the relationship of the people.  Unfortunately from your side, as I read it, the Fourth Circuit has taken the language of the rule and completely read out the word "mistake" from it, and made it -- I guess maybe the Supreme Court helped with it, too -- but they have made it say that if these people should have known they were going to be sued about this, whether they were left out by mistake or other reason, they could be defendants.  That is pretty much the rule, isn't it?

MS MAUGHAN:  I agree with that to the extent, and that is unfortunate, because it causes a lot of trouble.  I will note that in part of the defendant's response to the motion to amend we had a quotation from Judge Gregory in the concurring opinion that changed the landscape of the relation back doctrine.

I believe that was, what he said was, you know, despite allthe things we have done with the opinion, it

is reasonable to expect plaintiff properly to identify those whom they hail into court.  It is likewise reasonable to penalize plaintiffs who tarry too long by forbidding them to substitute the correct defendant after the limitations period has expired.

THE COURT:  So he says that it took you all a while to give them the names of the people.

MS MAUGHAN:  It did.  I apologize for that.

THE COURT:  I used to represent the State.  I know getting information from agencies is like pulling teeth.

MS MAUGHAN:  Well, I have to take blame for that, Your Honor.  It wasn't my agency, it was me.  After the hearing that we had in July I had a bullet list of things to give to plaintiff's counsel, and I gave them, I believe, everything except those names.  It just slipped my mind.  I had a lot of things --

THE COURT:  Well, that's all right.  Don't let it worry you.

This whole issue of who knew what, and when they knew it, is going to have to be the subject of I think a fairly comprehensive summary judgment motion at some point in the future.

MS MAUGHAN:  I understand that, Your Honor.  I will add for The Court one thing that was in our

response of our motion to amend, as to the medical defendant who were initially identified as Does, most of those people I would are likely not, I would not be representing them.  They would likely be represented by a private law firm.

THE COURT:  Why is that?

MS MAUGHAN:  Generally my section, and generally myself, I do not represent medical defendants in medical malpractice claims of any sort.  We would hire outside counsel for them.  So I can't affirmatively represent to The Court that I have not spoken to any of these people about this case, but I also don't know what they know or what they heard from someone else.

THE COURT:  Well, when this claim came in did you contact at least somebody in the head of the medical office out at Wallens Ridge to see if they knew anything about this, or tell them to save the documents and so forth?

MS MAUGHAN:  Of course, Your Honor.  We did a preservation request, and we gathered the medical records and all that, so forth.

THE COURT:  When did you do that?

MS MAUGHAN:  That probably would have been soon after the complaint came in, so maybe early 2021 as we were looking on our response.

THE COURT:  All right.

MS MAUGHAN:  Working to preserve everything.

THE COURT:  Okay.  So I think that you probably, unless there is something privileged in it, I think the letter preserving, telling those folks, telling various people to preserve documents about this, needs to be sent to the plaintiff in this case so that they will know who got it, and who was instructed to preserve documents.  I think that is a big part of figuring out who had notice of the claim.

MS MAUGHAN:  Right.  All right.

THE COURT:  Let me thank you very much for your candor in explaining that.  You know, I don't see that too often.  And I appreciate that.

MS MAUGHAN:  Well, I am glad that I could do that. I'm sorry that I am the exception.

THE COURT:  Did you do all correctional litigation?

MS MAUGHAN:  I do all corrections all the time. It is a high volume business.

THE COURT:  It is a high volume business.  I thank you for that.

MS MAUGHAN:  I appreciate it.

THE COURT:  So, tell me this.

I get your point about the ADA claims.  But -- and

what I really don't understand is this.  Am I correct that essentially to make an ADA claim against the Commonwealth the defendants have to pretty much prove an eighth amendment claim?

MS MAUGHAN:  Correct, Your Honor.  The plaintiff has to prove --

THE COURT:  Did I say "defendant?"  I meant the plaintiff has to prove that.

MS MAUGHAN:  Under the eighth amendment claim or a Constitutional violation.

THE COURT:  Well, in this case it would be an eighth.  I think it would be an eighth amendment.

MS MAUGHAN:  That would make the most sense.

THE COURT:  In the case out in Wallens Ridge.  And I don't understand what they get extra out of making an ADA claim.

MS MAUGHAN:  Nothing.

As far as the judgment being paid on behalf of an individual State employee versus the Commonwealth itself versus the Virginia Department of Corrections, as to punitive damages the Commonwealth is going to pay it.  The time that he was at Wallens Ridge from January 20 to May 20 of 2019, you know, specifically narrowing it down from the time he started making complaints about ADA issues in April is very, very

small.  I don't think there is any causation evidence that is going to show that the failure to provide accommodations of that small magnitude had an effect on the outcome of his health.

THE COURT:  Have you hired a lawyer yet for the --

MS MAUGHAN:  No, we have not.  We typically would not do that until the complaint was actually filed or in the process of being served.

THE COURT:  You probably ought to do that.

Are you going to hire in Mr. McNellis to do that?

MS MAUGHAN:  Unfortunately I don't have any control over that process.

THE COURT:  All right.

MS MAUGHAN:  It may be Mr. McNellis, it may be someone else.  We have a pretty good list.

A couple of other things if I could on the motion --

THE COURT:  Sure.

MS MAUGHAN:  -- to dismiss as to the count five, supervisory liability claims.

So, count five I want to note for The Court is a failure to train, supervisory liability claim, against supervisors Clarke, Robinson, Mr. Morano, and Warden Manis at Wallens Ridge.  Failure to train claim based alleged failure to train subordinates in ADA

accommodation.  So count five the problem is that there is not an underlying Constitutional violation.  Even if the subordinates violated the ADA by failing to provide appropriate accommodation, that is not a Constitutional violation for which the supervisors can be held liable in a supervisory liability context because --

THE COURT:  Well, but suppose that there is no supervisory liability under ADA.

MS MAUGHAN:  As far as I know there is not, Your Honor.  I don't believe that there is any individual liability under the ADA, its an entity effectively.

THE COURT:  Okay.  So suppose that the ADA violation was that they took away his crutch so he couldn't walk.  That is probably an eighth amendment as well.  Would that get them into supervisory liability?

MS MAUGHAN:  The answer to the first question, I don't think necessarily that presupposes an eighth amendment violation to take away someone's crutch given the allegations of the harm that it caused.

THE COURT:  Let's assume it was real bad harm.

MS MAUGHAN:  All right.

THE COURT:  Let's assume somebody without a crutch couldn't walk around the prison and was then in terrible pain as a result.

MS MAUGHAN:  I still don't think that supports any

sort of claim under the ADA, because it is difficult because the way it is pled it makes -- mixes together the ADA and eighth amendment.  I think you have take pains to separate that out.

To the extent we get into he couldn't get medical treatment, or couldn't get the right medical treatment, the ADA expressly doesn't cover that.  So if it is a failure to train people in how to accommodate someone with a disability to move about the prison in general, that may be an ADA issue, which certainly does not rise to the level of an eighth amendment or Constitutional claim.

THE COURT:  Well, what if they frisked him every time he walked?

MS MAUGHAN:  That would be intentional.

THE COURT:  That would be an ADA violation, wouldn't it?

MS MAUGHAN:  You know if they intentionally physically casued harm to someone I don't think that would be an ADA violation, so it may be a Constitutional violation, use of force.

THE COURT:  You can't have anintentional ADA violation?

MS MAUGHAN:  Interesting that The Court should bring that up.  There was a Fourth Circuit opinion that

came out on the 11th.  I didn't have time to look for a reported copy, but I have the copy that I printed from the Fourth Circuit web site.  I'm happy to hand that to The Court and counsel.  But, in that case --

THE COURT:  Give that to the Security Officer.

MS MAUGHAN:  If The Court would like a minute to read it, it is very short or I can talk about it.  But I will be quiet while The Court is looking at it.

THE COURT:  Well, I remember seeing this.  I remember thinking about this case when it came out because it has got the mootness part of it.  And I think, well, that sort of applies to some of the claims that come up in this case.

MS MAUGHAN:  In this case I admit it is not a hundred percent aligned with the facts of the Garrett case, but the main take away in Cason, C-A-S-O-N, is that ADA claim for money damages has to allege intentional discrimination.  It is interesting this, the Cason case, was also a corrections style case, an allegation of disability accommodations that were not provided.  I think in a Maryland jail or Maryland prison.  It was Rights Behind Bars, some of the counsel in this case represented the appellant in Cason.

THE COURT:  Right.

MS MAUGHAN:  The opinion I think everyone agrees

has to be at least deliberate indifference to get money damages in that type of context.  So we just wanted to point The Court's attention to that opinion.  It was fairly recent.

THE COURT:  Okay.  Thank you.

MS MAUGHAN:  And then as I was researching for this hearing and preparing I came across another case that has been out for quite some time, it's Wilder versus Virginia, W-I-L-D-E-R, 496 US 498.  And it talks about, it's not in the context of an ADA claim, but it talks about whether you can bring a claim under 1983 as a vehicle for bringing a claim.  It is a violation that underlies that 1983 claim is a violation of federal law, federal statute, as opposed to the Constitution.  So it says you can do that, except when there is a sufficiently-comprehensive statute that allows you to bring the same cause of action, effectively.  I am summarizing.  So I would analogize that case to this case if ADA provides a very comprehensive way of plaintiffs bringing claims.

THE COURT:  You are saying that supplants the eighth amendment?

MS MAUGHAN:  No, but --

THE COURT:  You are saying the question in a 1983 case at law case, as opposed to a Constitutional case,

1983 says you can sue for violation of the Constitution at law.  What we are talking about is an at law case.  And what you are saying is that if the law itself provides a comprehensive enforcement mechanism you can't bring a 1983 claim, and that is why you can't bring a 1983 action to enforce the Clean Water Act.  Is that what you are saying here?

MS MAUGHAN:  That is exactly it.  You summarized it much better than I did, yes.

THE COURT:  Well, okay.

MS MAUGHAN:  So as that relates to count five, that is one of the reasons it is very important to separate out whether this is an ADA claim or it's an eighth amendment claim, because you can't mix them together and call it a 1983 claim.

THE COURT:  Okay.

MS MAUGHAN:  The other issue as to count nine in the ADA claim, this was noted in the parties briefs when we filed the --

THE COURT:  Remind me which one is count nine.

MS MAUGHAN:  Count nine is the ADA claim against Department of Corrections.  So, and as it relates to sovereign immunity and money damages.  We noted when were briefing this case that this argument is on appeal in a case that came out of this court.  And as of last

week when I checked that case has not been set for argument, and because the next argument session is May, I don't think it will be set until September.  So I just wanted The Court to know that is pending on appeal, if that is helpful.

THE COURT:  You can wait for a while for the Fourth Circuit.

MS MAUGHAN:  All right.

I will address two other things that came up in plaintiff's argument.  Just the issue of discovery.  I think this Court is aware there is a companion case in the Western District of Virginia that is a little bit, couple months ahead of this case.  So we have discussed discovery informally to the extent --

THE COURT:  Is that a medical care case from Wallens Ridge?

MS MAUGHAN:  I believe --

THE COURT:  Is that a dog bite case?

MS MAUGHAN:  Out of Red Onion.  Similar to the extent there was a dog bite.  I don't believe it alleges ADA accommodation issues.

THE COURT:  Does it allege eighth amendment failure to provide care?

MR. TALBOT:  No, Your Honor.

THE COURT:  You have got that, too?

MR. TALBOT:  I do not personally, but other attorneys at my firm, and right --

MR. NIMNI:  I do as well.

MR. TALBOT:  I don't personally.

THE COURT:  I didn't realize Arnold Porter was an eighth amendment specialist firm.

MS MAUGHAN:  We had discussion trying to consolidate that as best we can, so a lot of discovery as to the supervisor is going to overlap.

THE COURT:  Which judge has that?

MS MAUGHAN:  I believe it is Judge Urbanski.

THE COURT:  I probably need to talk to Judge Urbanski about that.

MR. TALBOT:  Yes.  Urbanski.

THE COURT:  What is the name of that case?

MS MAUGHAN:  Johnson.  Corey Johnson, C-O-R-E-Y Johnson versus McCowan, M-c-C-O-W-A-N.

THE COURT:  Okay.  Is that case set for trial?

MS MAUGHAN:  It is.  I believe in January of 2023.

THE COURT:  Okay.

MR. TALBOT:  Yes, Your Honor, that's right.

MS MAUGHAN:  That was in consideration about discovery, trying to keep everything together if we can.

THE COURT:  Do you want me, are you suggesting I

should transfer this case to Judge Urbanski?

MS MAUGHAN:  I would love to consolidate them all. I don't know that that is necessarily legally appropriate.  I would have to research it.

THE COURT:  Well, if nobody complains.

What do you think about that, Mr. Talbot?

MR. TALBOT:  Judge, I am not --

THE COURT:  You probably don't have the authority to say that today.

MR. TALBOT:  I would just point out these are totally different incidents, much different claims.  I think we are happy, we have had discussions about coordinating discovery if possible, but these are not the same case.

THE COURT:  Okay.  All right.  Thank you.

MS MAUGHAN:  Just to respond a little bit on the declaratory judgment act.  I do agree that a declaratory judgment could be useful to terminate a controversy, but the subset, the argument to that is that it is useful to terminate a controversy that affects how or whether a case is going to proceed.  So the best example I can think of is in an insurance defense case where an insurer says I am not going to defend you, so --

THE COURT:  The classic dec action that we get

here in court.

MS MAUGHAN:  Right.  And that makes sense because whether or not someone can sue or whether or not someone can be defended, that affects how the case goes forward.  In this case the example cited by plaintiff about the controversy talked the board of supervisors inadequately training a subordinate.  Excessive force issue.  Who was responsible for training?  What did they do?  All of that goes to the merits of the claim.  Doesn't go to a declaratory judgment.  I don't think in a declaratory judgment does anything for the plaintiff in this case.  Because it doesn't do anything it verges on as an advisory opinion and it shouldn't be appropriate.

So what else?  We ask The Court to dismiss any claim for declaratory judgment even at this early stage.

I believe that covers everything I wanted to talk to The Court about.

If there are questions, I am happy to answer them.

THE COURT:  I don't think so.  Thank you, though.

MS MAUGHAN:  Thank you.

THE COURT:  All right.

Do you have any response to that?

MR. TALBOT:  May I briefly respond?

THE COURT:  Yes.

MR. TALBOT:  So, Judge, I just want to very briefly respond to a couple of the pointss about count five and nine which concern the disability accommodation claims.  So, I just want to make clear that count five is an eighth amendment claim for failure to -- it is a supervisory liability claim based on eighth amendment viol -- or its an eighth constitutes an eighth amendment violation about supervisors.  So, the underlying conduct by the subordinates, that was a denial of disability accommodations.  They took away -- they denied Mr. Garrett his cane, would not bring him his meals.  But the reason that that conduct also constitutes an eighth amendment violation is because it deprived Mr. Garrett of care that was prescribed by his physician.  The doctor provided him a cane to alleviate the pain and allow his wounds to heal, and also the doctor provided him nerve pain medication for the acute nerve pain that he experienced in his arm and leg where he was attacked by the dogs.  Without his crutch he couldn't get to the medication in time because the prison only provided the medication during a narrow window.

So, without the cane he experienced avoidable

substantial pain based on his wounds, and he also couldn't get to his medicine in time. So that is why conduct that we say violates the ADA also violates the eighth amendment.

And I will just point out that this case that I was, was brought to my attention today, we certainly have shown intentional violation of the ADA because that conduct certainly constitutes deliberate indifference. I know the standard is a little different under the eighth amendment and ADA, but the prison staff knew that Mr. Garrett had a serious medical need, they knew that the physician had provided, or had prescribed to him a cane and medication. And they deprived him of access to that treatment.

So I would respectfully submit that we have shown an eighth amendment violation by the subordinates which allows our supervisory liability claim to survive. And then we have also shown eighth amendment violation for count nine that independently violates the constitution. So even if you put aside whether Congress can enact prophylactic legislation, this is clearly, ADA title II of the ADA clearly survives, or it is a valid obligation of sovereign immunity for Mr. Garrett's claims just because his claims are alleging

Constitutional violations.

THE COURT:  All right.  Thank you.

I am going to grant the motion to file a third amended complaint, and deny the motion to dismiss.

I am going to kind of reserve the right to address the ADA issues in an opinion, but for right now you can move ahead with the third amended complaint.  I am going to issue a very brief opinion on the statute of limitations question.  I think the question with the statute of limitations depends on facts that have not been fully developed yet.

So here is what I am going to do.  I am going to -- typically we only allow a defendant to file one judgment motion in a case.  In this case I am going to give the defendant the opportunity to file a special, and somewhat earlier summary judgment decision on the issue of the statute of limitations.  And that will be due July 15th.  So you all need to hop on discovery in this case.

I hope July 15 is not a Sunday.

MS MAUGHAN:  It is a Friday, Your Honor.

THE COURT:  What is that?

MS MAUGHAN:  A Friday.

THE COURT:  Oh, good.

All right.  July 15.

And then we will set the trial in this case on October 17 through 21.

How does that look for you, Ms Maughan?

Am I pronouncing your name correctly, Maughan?

MS MAUGHAN:  That's right.

THE COURT:  Okay.

MS MAUGHAN:  Those dates work for me, Your Honor. I do have --

THE COURT:  I know you have got expert witnesses and things like that.  So, we will tentatively set it then.

Do you have an expert?

MR. TALBOT:  We have.  We have discussions with experts.

THE COURT:  You better have more than discussions.

MR. TALBOT:  They are starting to work, yes.

THE COURT:  Okay.

Do you have an expert outside of the Department?

MS MAUGHAN:  We don't yet, Your Honor.

THE COURT:  Well, you better hop on that.

MS MAUGHAN:  I will, Your Honor.

There is another concern that I have, and I wasn't necessarily prepared to deal with the issue of setting a trial date, one of the defendants, one of the dog handlers, Mr. Franklin, is on active duty military

assignment overseas right now.  I have not sufficiently moved to stay the case.  We discussed this informally that that might be an issue where we could proceed without him and go forward with everything else.  We haven't yet come to agreement or anything dealing with on how to deal with that.  But as far as I know, he is pretty much out of contact, out of pocket right now.

THE COURT:  Is he a reservist?

MS MAUGHAN:  I believe he is a reservist, and I think his orders said that he was going to be, I don't want to guess, I can't remember how long he was going to be gone.

THE COURT:  Why don't you check on that.  If these trial dates cause problems, let me know.  Okay?

MS MAUGHAN:  Okay.

THE COURT:  We are far enough out that we can deal with some things.  I will also talk to Judge Urbanski about making sure our discovery is coordinated.  Okay?

MS MAUGHAN:  Your Honor, if I could as well, if The Court is willing to refer the case for medication the defendants are interested.

THE COURT:  I will send you to Judge Colombell.

MS MAUGHAN:  Thank you, Your Honor.

THE COURT:  So, you need to go down and see Judge Colombell this morning and get a date to mediate this

case.

MR. TALBOT:  Yes, Your Honor.

THE COURT:  All right.

MS MAUGHAN:  Right thank you so much, Your Honor.

THE COURT:  All right.

Anything also?

MR. TALBOT:  No, sir.

THE COURT:  Thank you all.

Let me see counsel back in my chambers after we are done today, okay?

Thank you very much.

HEARING ADJOURNED.

THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

GILBERT FRANK HALASZ, RMR

Official Court Reporter